No. 04-712

IN THE SUPREME COURT OF THE STATE OF MONTANA

2005 MT 275

IN THE MATTER OF THE CUSTODY
AND PARENTAL RIGHTS OF D.S.,

   A Youth in Need of Care.

APPEAL FROM:   District Court of the First Judicial District,
               In and for the County of Lewis and Clark, Cause No. CDN 2003-38
               The Honorable Thomas C. Honzel, Judge presiding.

COUNSEL OF RECORD:

       For Appellant:

               Jon G. Moog, Lewis and Clark County Assistant Public Defender, Helena,
               Montana

       For Respondent:

               Hon. Mike McGrath, Montana Attorney General, Joslyn M. Hunt, Assistant
               Attorney General, Helena, Montana; Leo Gallagher, Lewis and Clark County
               Attorney, Carolyn A. Clemens, Deputy County Attorney, Helena, Montana

                                   Submitted on Briefs:  May 11, 2005

                                         Decided:  November 2, 2005

Filed:

       _____
                          Clerk

Justice James C. Nelson delivered the Opinion of the Court.

¶1    A.S., the mother of D.S., appeals an Order of the District Court for the First Judicial District, Lewis and Clark County, terminating her parental rights to D.S. and granting legal custody of D.S. to the Department of Public Health and Human Services (DPHHS) with the right to consent to his adoption or guardianship.  We affirm.

¶2    We address the following issues on appeal:

¶3    1.  Whether § 41-3-423(2)(a), MCA, is void on its face for vagueness.

¶4    2.  Whether the District Court abused its discretion in terminating A.S.'s parental rights to D.S.

¶5    3.  Whether DPHHS failed to provide A.S. with sufficient notice.

### FACTUAL AND PROCEDURAL BACKGROUND

¶6    In November 1998, A.S. pled guilty to the criminal sale of dangerous drugs by accountability.  She received a three-year suspended sentence that was extended in December 1999 for an additional year.  A.S. was pregnant with D.S. at the time she pled guilty and she admitted to using methamphetamine while she was pregnant.  D.S. was born on May 12, 1999.

¶7    In February 2002, the State filed a petition to revoke A.S.'s suspended sentence.  The following month, A.S. entered an intensive out-patient treatment program at the Montana Chemical Dependency Center (MCDC), which she completed in April 2002.  Also in April, the District Court revoked her suspended sentence and re-imposed a four-year suspended sentence.

2

¶8     After completing the program at MCDC, A.S. entered an out-patient program at the Boyd Andrew Chemical Dependency Center (Boyd Andrew).  At that time, A.S. was pregnant with her second child, C.H.  A.S. left Boyd Andrew without completing her treatment because of complications with her pregnancy.  C.H. was born on June 26, 2002.[1] A.S. re-entered Boyd Andrew in August 2002, but was discharged for drug use and non-compliance.

¶9     In October 2002, A.S.'s probation officer arranged for her to obtain treatment at the Gateway Recovery Home (Gateway) in Great Falls.  While at Gateway, A.S. was allowed to keep her children with her.  However, she was discharged from Gateway in January 2003, for failing to progress through the program.  Thereafter, the State again filed a petition to revoke A.S.'s suspended sentence, but sentencing was continued for six months to give A.S. one final opportunity to prove herself.  On September 8, 2003, A.S. again tested positive for methamphetamine.  The State filed another petition to revoke her suspended sentence, and on September 29, 2003, A.S. was sentenced to four years at the Women's Correctional Center in Billings.

¶10    During the times A.S. was incarcerated or undergoing treatment, D.S. lived with various relatives including his aunt, his grandmother, and his godmother, Jeanne Peterson.  Peterson testified that every time A.S. got arrested and went to jail, it was between D.S.'s

---

[1] C.H. is not a party in this case.  In addition, D.S.'s father, C.S., has been incarcerated at Crossroads Correctional Center in Shelby since before D.S. was born. This appeal involves only the termination of A.S.'s parental rights to D.S.

aunt, his grandmother and Peterson to decide who would take care of D.S. When D.S. was two years old, he lived with Peterson for two or three months. He also lived with his grandmother for as long as eight months at a time.

¶11 On September 16, 2003, after A.S. again tested positive for methamphetamine, DPHHS petitioned the District Court for emergency protective services and requested an adjudication of D.S. as a youth in need of care. A.S. agreed by stipulation to DPHHS's requested relief and the District Court so ordered granting DPHHS temporary legal custody of D.S. On January 5, 2004, DPHHS filed a petition to terminate A.S.'s parental rights to D.S. DPHHS argued that reunification services were not necessary because A.S. subjected D.S. to an aggravated circumstance, namely abuse or neglect. An evidentiary hearing was held on June 8, 2004, after which the District Court concluded that A.S. subjected D.S. to chronic and severe emotional neglect. Consequently, the court terminated A.S.'s parental rights to D.S. and A.S. appeals.

**Issue 1.**

¶12 *Whether § 41-3-423(2)(a), MCA, is void on its face for vagueness.*

¶13 Section 41-3-423, MCA, provides in pertinent part:

(2) Except in a proceeding subject to the federal Indian Child Welfare Act, the department may, at any time during an abuse and neglect proceeding, make a request for a determination that preservation or reunification services need not be provided. If an indigent parent is not already represented by counsel, counsel must be appointed by the court at the time that a request is made for a determination under this subsection. A court may make a finding that the department need not make reasonable efforts to provide preservation or reunification services if the court finds that the parent has:

4

(a) subjected a child to *aggravated circumstances, including but not limited to* abandonment, torture, chronic abuse, or sexual abuse or chronic, severe neglect of a child; . . . . [Emphasis added.]

¶14 A.S. argues that this statute is unconstitutionally vague and fails to meet the requirements of the due process clause of Article II, Section 17 of the Montana Constitution because the term "including but not limited to" fails to clearly define the standard that would warrant either termination of parental rights or the withholding of reunification services. A.S. also argues that the statute fails to provide any direction to the courts in determining what an "aggravated circumstance" is, thus it impermissibly delegates basic policy matters to judges for resolution on an ad hoc basis.

¶15 Questions of constitutionality involve a plenary review by this Court. We review a district court's interpretation of the law for correctness. *State v. Bedwell*, 1999 MT 206, ¶ 4, 295 Mont. 476, ¶ 4, 985 P.2d 150, ¶ 4. Generally, the constitutionality of a statute is presumed and we will uphold a statute upon review unless an appellant proves the unconstitutionality of the statute beyond a reasonable doubt. *State v. Folda* (1994), 267 Mont. 523, 525-26, 885 P.2d 426, 427. Any doubt regarding the statute's constitutionality is resolved in favor of the statute. *State v. Turbiville*, 2003 MT 340, ¶ 18, 318 Mont. 451, ¶ 18, 81 P.3d 475, ¶ 18. Moreover, we will construe a statute to further, rather than to frustrate, the Legislature's intent according to the plain meaning of the statute's language. *State v. Ross* (1995), 269 Mont. 347, 352, 889 P.2d 161, 164.

¶16 A statute is vague on its face if it fails to give a person of ordinary intelligence fair notice that her contemplated conduct is forbidden. *Matter of T.A.S.* (1990), 244 Mont. 259,

262, 797 P.2d 217, 219. However, an appellant faces a high burden of proof in alleging that a statute is unconstitutionally vague on its face. In particular, she must show that the statute is vague "in the sense that no standard of conduct is specified at all." *State v. Martel* (1995), 273 Mont. 143, 151, 902 P.2d 14, 19.

¶17 The State argues on appeal, and we agree, that the fact that § 41-3-423(2)(a), MCA, does not contain an exhaustive list of conduct that constitutes an aggravated circumstance and that it allows the district courts some discretion in determining whether the evidence presented merits a finding of an aggravated circumstance, does not make the statute unconstitutionally vague. The United States Supreme Court has recognized that even when standards contained in a statute are flexible, and officials implementing them will exercise considerable discretion, perfect clarity and precise guidance are not required. *Ward v. Rock against Racism* (1989), 491 U.S. 781, 794, 109 S.Ct. 2746, 2755, 105 L.Ed.2d 661. Moreover, § 41-3-423(2)(a), MCA, lists several examples of conduct rising to the level of an aggravated circumstance, such as chronic, severe neglect, to which the District Court found A.S. subjected D.S. in this case.

¶18 Consequently, we conclude that A.S. has failed to prove that § 41-3-423(2)(a), MCA, does not give fair notice of any standard of conduct that would constitute an aggravated circumstance. Accordingly, we hold that § 41-3-423(2)(a), MCA, is not void for vagueness.

**Issue 2.**

¶19 *Whether the District Court abused its discretion in terminating A.S.'s parental rights to D.S.*

¶20 In its order terminating A.S.'s parental rights to D.S., the District Court concluded that D.S. suffered serious emotional and psychological damage as a result of A.S.'s chronic emotional neglect of D.S. and that, in effect, A.S. left D.S. "twisting in the wind for several years to the point where he now needs intensive long-term therapeutic treatment."

¶21 When reviewing a district court's determination to terminate an individual's parental rights, this Court reviews whether the district court's findings of fact are clearly erroneous and whether the district court's conclusions of law are correct as a matter of law. *In re D.B.*, 2004 MT 371, ¶ 30, 325 Mont. 13, ¶ 30, 103 P.3d 1026, ¶ 30. A district court's findings of fact are clearly erroneous when they are not supported by substantial evidence; when the district court misapprehended the effect of the evidence; or when, after reviewing the record, this Court has a definite and firm conviction that the district court has made a mistake. *In re D.B.*, ¶ 30. We review a district court's ultimate decision to terminate an individual's parental rights for an abuse of discretion. *In re J.B.K.*, 2004 MT 202, ¶ 13, 322 Mont. 286, ¶ 13, 95 P.3d 699, ¶ 13.

¶22 Even though A.S. was incarcerated at the time DPHHS petitioned to terminate her parental rights, DPHHS did not rely on § 41-3-609(4)(c), MCA, which provides that a treatment plan is not required for a parent who is or will be incarcerated for more than one year and reunification of the child with the parent is not in the best interests of the child. Instead, DPHHS relied on § 41-3-609(1)(d), MCA, and § 41-3-423(2)(a), MCA, which provides:

7

A court may make a finding that the department need not make reasonable efforts to provide preservation or reunification services if the court finds that the parent has:

(a) subjected a child to aggravated circumstances, including but not limited to abandonment, torture, chronic abuse, or sexual abuse *or chronic, severe neglect of a child*; . . . . [Emphasis added.]

¶23 A.S. argues that § 41-3-423(2), MCA, does not allow a district court to terminate parental rights based upon a finding of chronic and severe *emotional* neglect. However, § 41-3-102(7)(a)(i), MCA (2001), defines the phrase "child abuse or neglect" as "actual harm to a child's health or welfare" and § 41-3-102(11)(a), MCA (2001), defines the phrase "harm to a child's health or welfare" as

the harm that occurs whenever the parent or other person responsible for the child's welfare:

(a) inflicts or allows to be inflicted upon the child physical abuse, physical neglect, or *psychological* abuse or neglect; . . . . [Emphasis added.]

Furthermore, the 2003 Legislature amended § 41-3-102, MCA, to specifically target psychological neglect in its definition of child abuse or neglect. Section 41-3-102(7)(a)(i), MCA, now provides:

(a) "Child abuse or neglect" means:
(i) actual physical or *psychological* harm to a child;
(ii) substantial risk of physical or *psychological* harm to a child; . . . .
[Emphasis added.]

Consequently, under either statutory definition, "chronic, severe neglect of a child" includes chronic, severe *psychological* neglect.

¶24 In this case, substantial evidence did exist upon which the District Court could conclude that A.S. subjected D.S. to chronic, severe psychological neglect. Specifically, the

8

District Court heard evidence that throughout A.S.'s history of drug abuse and attempts at drug treatment, D.S. floated from one person's home to another. At various times prior to DPHHS's involvement, D.S. lived with his aunt, his grandmother and his godmother. Jeanne Peterson, D.S.'s godmother, testified that every time A.S. was arrested and sent to jail, it was up to her, D.S's aunt, and D.S's grandmother to jump in and take care of D.S. Peterson further testified that D.S. became so accustomed to floating from home to home that he simply made his home wherever his belongings happened to be.

¶25 This constant moving from home to home occurred at an age when D.S. needed to form strong bonds and to experience stability in order to develop normally. The instability in D.S.'s life affected his demeanor, which Peterson described as unruly and aggressive until she or D.S.'s grandmother would step in to care for D.S. for a time and provide some structure for him. Once that occurred, Peterson testified that his demeanor would change for the better. Peterson also testified that D.S. talked to her about being afraid of not knowing where he was going to live or with whom he was going to stay. In addition, according to Peterson, A.S.'s number one priority has always been herself, not her children.

¶26 Cheryl Ronish, a licensed clinical social worker with 14 years of experience, reiterated Peterson's observations. Ronish testified that D.S. had considerable anxiety--so much so that Ronish testified that she was not sure if she had ever seen a child as anxious as D.S. She noted that D.S. could never relax and that his anxiety level was so high, he continually walked around on his tiptoes. Ronish diagnosed D.S. with reactive attachment

9

disorder and anxiety disorder. She testified that these diagnoses were the result of inconsistent caregiving and D.S. not feeling safe or secure in his surroundings.

¶27 Ronish also testified that when she observed A.S. and D.S. together, A.S. wanted D.S. to interact in a manner that a three- or four-year-old child could not. A.S. did not understand what D.S. was saying or doing. In addition, A.S. did not pick up on D.S.'s clues when he needed A.S. to be close to him or when he needed A.S. to organize what was happening around him. Moreover, Ronish testified that A.S.'s focus was not about what she could give D.S., but about what D.S. could give her.

¶28 The District Court also heard testimony from Rita Pickering, an A.W.A.R.E. treatment services specialist. Pickering described numerous extreme behaviors of D.S., namely, that he was aggressive and angry; he was sodomizing himself; he had various types of repetitive and compulsive habits, such as walking on his tiptoes; he had sleeping problems; and he was afraid of men. Pickering testified that A.S. did not want Pickering's assistance with D.S. as A.S. was only seeing Pickering to comply with A.S.'s probation. Pickering also testified that when D.S. was living with his grandmother, D.S.'s behavioral problems improved, but upon A.S.'s return, D.S. again began to have difficulties.

¶29 In her own testimony before the court, A.S. admitted that she had not been emotionally available to D.S. As a result of A.S.'s emotional cutoff, D.S. developed what Heather Cashell, D.S.'s treatment manager, testified to as a "flat affect" in modulating his emotions and tone. Cashell stated that D.S. described situations of abuse in a joyful tone and that he was not aware of what emotions he should be experiencing in various situations.

10

Cashell testified that D.S.'s flat affect was a coping mechanism from years of being emotionally cutoff. Randy Koutnik, a social worker with DPHHS, testified that the most appropriate treatment for D.S. was in a therapeutic foster home because at age five he was too young for residential treatment and a therapeutic foster home is the highest level of care available to an individual prior to residential treatment.

¶30 The District Court also heard testimony from various experts and from Peterson, D.S.'s godmother, that since D.S. has been with his foster family, he is happy, calm and growing to trust adults. They were in agreement that to uproot D.S. now, after the progress he has made in the months he has been separated from A.S., would be detrimental to him emotionally, especially considering that his great emotional needs are finally being met.

¶31 Based on the foregoing, we hold that the District Court did have substantial evidence to conclude that A.S. subjected D.S. to chronic and severe emotional neglect and that the District Court did not abuse its discretion in terminating A.S.'s parental rights to D.S.

**Issue 3.**

¶32 *Whether DPHHS failed to provide A.S. with sufficient notice.*

¶33 A.S. argues on appeal that she did not receive sufficient notice regarding which statutory criteria DPHHS intended to rely upon in terminating her parental rights. DPHHS determined that reunification efforts between A.S. and D.S. were not necessary because A.S. subjected D.S. to aggravated circumstances "including but not limited to abandonment, torture, chronic abuse, or sexual abuse, or chronic, severe neglect" citing § 41-3-609(1)(d) and § 41-3-423(2)(a), MCA. A.S. argues that this "shotgun" notice failed under this Court's

11

holding in *State v. Croteau* (1991), 248 Mont. 403, 812 P.2d 1251, and therefore, the notice was not sufficient. Although the District Court did not make a specific finding regarding the notice argument A.S. now presents, A.S. did make this argument in her brief in opposition to the State's petition to terminate A.S.'s parental rights, thereby preserving this issue for appeal.

¶34    The defendant in *Croteau* was convicted on two counts of sexual assault following a jury trial. He appealed to this Court claiming that the District Court erred in allowing the State to introduce evidence of prior sexual acts. We reiterated in *Croteau* that

> [e]vidence of other crimes may not be received unless there has been notice to the defendant that such evidence is to be introduced. . . .   Additionally, the notice to the defendant shall include a statement as to the purposes for which such evidence is to be admitted.

*Croteau*, 248 Mont. at 408, 812 P.2d at 1254 (quoting *State v. Just* (1979), 184 Mont. 262, 274, 602 P.2d 957, 963-64).

¶35    In its notice to the defendant in *Croteau,* the State used a "shotgun" approach and named all of the possible reasons, with the exception of motive, set forth in Rule 404(b), M.R.Evid. We determined in that case that in order for the defendant to prepare to defend against prior acts or crimes testimony, the State must give the defendant timely and "specific" notice of intent to introduce such evidence. *Croteau*, 248 Mont. at 409, 812 P.2d at 1254.

¶36    Contrary to A.S.'s contentions, *Croteau* is not applicable in this case because the notice requirement in Croteau was specific to a party's request for admission of evidence of

a defendant's other crimes or prior acts in a criminal prosecution. Furthermore, DPHHS is statutorily required to provide notice. *See* § 41-3-608, MCA.

¶37 In the case *sub judice*, DPHHS's notice was indeed a shotgun approach in that it stated:

> No treatment plan was prepared for the parents and no efforts were made to provide preservation or reunification services for the reason that the parents subjected the youth to aggravated circumstances . . . including but not limited to abandonment, torture, chronic abuse, or sexual abuse, or chronic, severe neglect of the youth.

This type of notice is unacceptable and we admonish DPHHS to refrain from using this type of notice in the future.

¶38 That said, we are mindful that the district court is bound to give primary consideration to the physical, mental and emotional conditions and needs of the children and that, consequently, the best interests of the children are of paramount concern in a parental rights termination proceeding and take precedence over parental rights. *In re J.W.*, 2001 MT 86, ¶ 8, 305 Mont. 149, ¶ 8, 23 P.3d 916, ¶ 8 (citing *Matter of C.M.* (1997), 281 Mont. 183, 187, 932 P.2d 1063, 1066.

¶39 With that rule in mind, we are disinclined to reverse the District Court's decision on the basis of DPHHS's faulty notice because the seven-page affidavit served on A.S. along with the petition delineated the nature of the abuse or neglect to which D.S. was subjected and, thus, provided A.S. with adequate notice of the same. Because of A.S.'s incarceration, a reunification plan would take a minimum of six months to complete, thereby requiring that

D.S. again be uprooted, and a continuation of A.S.'s relationship with D.S. would likely result in continued abuse or neglect.

¶40    Accordingly, we affirm the decision of the District Court to terminate A.S.'s parental rights to D.S.

¶41    Affirmed.

/S/ JAMES C. NELSON

We Concur:

/S/ W. WILLIAM LEAPHART
/S/ JOHN WARNER
/S/ BRIAN MORRIS

Chief Justice Karla M. Gray, specially concurring.

¶42    I join the Court's opinion in its entirety, but with one caveat.  I write separately to address that caveat and express my serious and ongoing concerns about the manner in which youth in need of care/termination of parental rights cases are being handled by DPHHS, those who prosecute on behalf of DPHHS, and the trial courts.

¶43    My caveat relates to the Court's statement in ¶ 38, relying on *J.W.* and *C.M.*, that the best interests of the children must take precedence over parental rights.  The cited cases--and many others--do so state and I generally agree.  Neither those cases nor the present case, however, presents a constitutional issue raised by a parent.  In such a case, the general rule may not be applicable, in my view.

¶44    The Court properly addresses, and rejects, the only authority advanced by A.S. on the notice issue.  It then, and on that basis, affirms the District Court.  I agree.  It is appropriate, however, that more be said about existing jurisprudence on this issue, jurisprudence DPHHS and its prosecutors apparently are happy to ignore.

¶45    DPHHS has been on direct notice since December 31, 2001, the date we decided *In re T.C.*, 2001 MT 264, 307 Mont. 244, 37 P.3d 70, of the necessity of providing constitutional due process via adequate notice in its petitions to terminate.  There, DPHHS's petition to terminate was premised on § 41-3-609(1)(f), MCA, a parent's failure to comply with a treatment plan.  At the hearing, DPHHS moved to amend the pleading to conform with evidence presented by allowing it to include abandonment as a new statutory basis for

termination. The trial court overruled the mother's objection based on lack of notice, and allowed the amendment. On appeal by the mother, DPHHS argued that sufficient facts were pled in the petition to support a claim of abandonment and, consequently, the mother received adequate notice of DPHHS's intent to present evidence supporting a theory of abandonment. *T.C.*, ¶ 21.

¶46 This Court did not agree. We stated clearly and without equivocation that the natural parent's fundamental liberty interest in parenting must be protected by the courts with fundamentally fair procedures. We stated that due process requires both notice and an opportunity to be heard, observing that the "opportunity to be heard" encompasses an opportunity for the parent to prepare her case on the issues raised by the pleadings. *T.C.*, ¶ 22 (citations omitted). In considering whether DPHHS's original pleading gave notice of the abandonment issue, we looked at the claim "as a whole and to 'the reason and spirit of the allegations in ascertaining its real purpose.'" *T.C.*, ¶ 23 (citations omitted). We concluded that the petition at issue did not provide sufficient notice to the mother on the issue of abandonment. We refused to force a parent to glean from facts pled which claim or claims DPHHS would bring to hearing; nor were we willing to accept DPHHS's reasoning that its failure to plead abandonment was a "technical deficiency." We concluded the trial court had erred in allowing DPHHS to amend its pleadings during the hearing to include a new theory. *T.C.*, ¶¶ 24-25.

¶47 Here, DPHHS's notice stated:

> [n]o treatment plan was prepared for the parents and no efforts were made to provide preservation or reunification services for the reason that the parents subjected the youth to aggravated circumstances . . . including but not limited to abandonment, torture, chronic abuse, or sexual abuse, or chronic, severe neglect of the youth.

This so-called "notice"--actually a mere recitation of most of the language contained in § 41-3-423(2)(a), MCA--includes a minimum of five purported grounds for an aggravated circumstances determination by the trial court. A fair characterization of the "notice" is that it is a shotgun approach to pleading. As such, pursuant to *T.C.*, it is my view that the pleading gives insufficient notice for purposes of a parent preparing to defend against a petition to terminate. A parent--indeed, competent counsel for a parent--simply could not prepare to meet at least five, and potentially a universe ("but not limited to"), of generic categorical bases asserted against him or her.

¶48    When might we expect DPHHS and its prosecutors--and, indeed, the trial courts who, pursuant to *T.C.*, have a duty to protect parents' rights via fundamentally fair procedures--to proceed pursuant to the law? The only rational answer at this point appears to be "never." And why? I can conceive of no basis for the continuing approach by most concerned to be expedient, while ignoring the law. Must we actually start wholesale reversals in these kinds of cases, an action almost certain to harm children in many cases, to get the attention of those charged with statutory and jurisprudential duties in these cases? It appears so.

¶49    I recently expressed these and similar concerns in *In the Matter of  S.C. and L.Z.*, 2005 MT 241, ¶¶ 38-51, 328 Mont. 476, ¶¶ 38-51, ___ P.3d ___, ¶¶ 38-51 (Gray, C.J., concurring and dissenting). There, I also listed my numerous concurring and dissenting

opinions in termination of parental rights cases along similar lines since 1993. *See S.C. and L.Z.*, ¶ 41. I am tired of writing these separate opinions--tired, but unwilling to cease.

¶50 I close with yet another instance--like the several referenced in ¶¶ 38 and 39 of my concurring and dissenting opinion in *S.C. and L.Z.,* and also similar to one in *T.C.*, ¶ 24--of the untenable attitude which seems to permeate DPHHS, or at least its counsel, in these appeals. In this case, counsel for DPHHS contends that A.S.'s argument regarding notice "is nothing more than a technicality of form over substance." In light of our decision in *T.C.*, and the numerous authorities cited therein, this is a truly frightening response to a due process constitutional challenge by a parent attempting to protect her fundamental constitutional right to parent her child. What has been wrought in the guise of protecting children?

¶51 I join in the Court's opinion. Having been unsuccessful in garnering DPHHS's attention for well over a decade, perhaps my best hope now lies in the current legislative interim study of matters related to cases of this type. I wish them well but recognize, with sadness, that it is not the law that is lacking, it is the will to follow it!


/S/ KARLA M. GRAY

18