DA 11-0195

# IN THE SUPREME COURT OF THE STATE OF MONTANA

## 2011 MT 245

IN THE MATTER OF:

M.N., J.N., Jr., and R.N.

      Youths In Need of Care.

APPEAL FROM:    District Court of the Eighth Judicial District,
In and For the County of Cascade, Cause Nos. BDN 10-057, BDN 10-058, BDN 10-134
Honorable Julie Macek, Presiding Judge

COUNSEL OF RECORD:

    For Appellant:

        Joslyn Hunt, Chief Appellate Defender; Garrett R. Norcott, Assistant
Appellate Defender; Helena, Montana (for Mother and Father)

        Travis Cushman, Attorney at Law; Great Falls, Montana (for Youths)

    For Appellee:

        Steve Bullock, Montana Attorney General; Matthew T. Cochenour,
Assistant Attorney General; Helena, Montana

        John Parker, Cascade County Attorney; Jennifer Ropp, Deputy County
Attorney; Great Falls, Montana

                Submitted on Briefs:  August 17, 2011

                        Decided:  October 4, 2011

Filed:

            _____
                      Clerk

Justice Beth Baker delivered the Opinion of the Court.

¶1 Mother and Father of the youths M.N., J.N. Jr. ("J.N."), and R.N. appeal from the Eighth Judicial District Court's order terminating their parental rights. Based on a finding of "chronic, severe neglect" under § 41-3-423(2)(a), MCA, the court found the Montana Department of Public Health and Human Services ("Department") was not required to make reasonable efforts to reunify all three children with their parents. The parents appeal the court's failure to require reunification efforts or order a treatment plan prior to terminating their rights. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

¶2 Mother and Father have been involved with the Department for many years. Father was previously married to W.N. and fathered two children with her who are not involved in this case, T.N. and C.N. In 2005, C.N. and T.N. were adjudicated as Youths in Need of Care and treatment plans were ordered. Father did not complete the treatment plan and the case ultimately was dismissed with custody to W.N. In 2007, C.N. and T.N. were again adjudicated as Youths in Need of Care. The Department began working with Mother and Father as a possible placement for C.N. and T.N. Mother volunteered to submit to family based services and evaluations. The Department provided services and training to pursue the possible placement. To those ends, a behavioral specialist visited Mother and Father's home. There, she found conditions of filth and foul odor. At the time, J.N., the eldest child of Mother and Father, was an infant. The Department provided extensive one-on-one services to teach the parents how to maintain a safe home

2

for an infant and instruction on family skill building, behavior skill building and organization.

¶3 As part of the Department's services, Dr. Jeanette Heberle, a licensed psychologist, conducted an evaluation of Mother and determined she was mildly impaired in her cognitive abilities equating to mild mental retardation. Dr. Heberle found Mother likely functions at the level of a ten-year-old, making it difficult for her to address a child's ongoing and evolving needs. The Department ultimately concluded T.N. and C.N. could not be placed in the home because Mother was not capable of parenting more than one child at a time. Father later relinquished his rights to T.N. and C.N.

¶4 In October 2008, Judy Hartelius, a child protection specialist with the Department, made an unannounced home visit to Mother and Father's residence and concluded the home was below minimum safety standards. Ms. Hartelius observed the home would be unsafe for J.N., then fifteen months old, because of the significant amount of clothing, trash and small items all over the floor. Ms. Hartelius admonished and counseled Mother and Father on the safety hazards. She made two additional unannounced visits in the following month and found the conditions had further deteriorated.

¶5 In December 2008, the Department filed a petition for an adjudication and temporary legal custody of J.N. based on physical neglect and the parents' inability to provide a safe, clean environment for him. The Department established a treatment plan and provided extensive services to benefit Mother and Father over the next fourteen months. These services included training and instruction from mental health workers, behavioral specialists, and family support specialists. During this period Mother gave

3

birth to M.N. The court noted the Department provided "206 hours of intensive one-on-one parenting [skills]" and basic life skills training to teach them to keep a safe and clean home, in addition to providing physical therapy and speech therapy for J.N. and M.N.

¶6 The Department held two family group meetings in January 2010 to "make sure that they continued on with the services that were in place." The parents agreed to maintain speech and physical therapy for the children and to continue working with the family support specialist. Soon thereafter the Department dismissed the 2008 petition because Mother and Father had met minimal standards for the preceding six months. Shortly after the Department dismissed the petition, Mother and Father ceased using all services. In March 2010, Mother and Father told the physical therapist "they were going to take a break from going to therapy," and discontinued treatment with both the physical therapist and the speech therapist. In April 2010, Mother cancelled services provided by the family support specialist.

¶7 Two months and five days after the Department dismissed the 2008 petition, J.N. was admitted to Benefis Hospital in Great Falls, Montana with a "depressed skull fracture." The injury required surgeons to place a metal plate inside J.N.'s head "to lift the fragments [of his skull] up and get them level with the table of the skull so that it would heal in a flat manner." Sharlene Barragan, a child protection specialist with the Department, contacted law enforcement about a possible assault on J.N. Mother and Father then provided several inconsistent and changing stories as to how J.N. had been injured. Investigators were unable to determine the cause of the injury.

¶8    At the hospital, the Department placed J.N. on a forty-hour hold and arranged for M.N. to stay with a family friend. At approximately 6:30 p.m., J.N. was crying for food and Mother commented the children would be hungry as they had not eaten since the morning. As Ms. Barragan was leaving the hospital, Mother handed her a bottle for M.N. with a nipple that appeared to be covered in mold. Barragan then went to the parents' home to pick up a nebulizer for M.N. Once inside the home, Barragan was struck by a foul smell, food stains rubbed on the floor and counters and an "extremely dirty" highchair that was caked with food.

¶9    The Department filed a petition on April 23, 2010, seeking emergency protective services, adjudications as Youths in Need of Care, and temporary legal custody of J.N. and M.N. The parents stipulated the Department had met its burden for the petition in light of J.N.'s serious head injury and the insufficient explanation for the injury. The children were adjudicated Youths in Need of Care and the court granted temporary legal custody to the Department on May 27, 2010. No treatment plans were ordered and the Department filed petitions for termination of parental rights and permanent legal custody due to chronic and severe physical neglect.

¶10    Both parents underwent psychological evaluations by two forensic psychologists, Dr. Robert Page and Dr. Patrick Davis. Dr. Page expressed reluctance to recommend reunification without knowing how J.N. had been injured. He testified the inconsistent stories raised a question of accountability on the parents' part and implied "the priority is to protect one and not one's child." Moreover, Dr. Page noted though Mother could perform basic tasks, she would require help in responding to stressful, difficult or

5

dangerous situations with children. Dr. Davis concluded both Mother and Father were unable to parent and would not have the capacity to parent within a reasonable time. He stated only with "one-on-one 24-hour supervision" could Mother and Father effectively parent the children.

¶11 On July 21, 2010, the Department petitioned for a determination that reasonable efforts at reunification were not required under § 41-3-423(2)(a), MCA, and sought termination of parental rights and a grant of permanent legal custody of J.N. and M.N. to the Department. R.N. was born on October 17, 2010. Pursuant to § 41-3-422(1)(d), MCA, the State petitioned for termination without reunification services as to R.N. based on the same factual and statutory grounds it had raised with respect to M.N. and J.N. The companion petitions were heard together.

¶12 The hearing began on December 16, 2010. After the Attorney for the Youth moved for a continuance, the hearing resumed on February 7, 2011, and concluded on February 8, 2011. The State called nineteen witnesses, including social workers, in-home behavioral specialists, police officers, forensic psychologists, a family support specialist, and a child protection specialist.

¶13 In its order dated March 9, 2011, the District Court found clear and convincing evidence showed Mother and Father had subjected J.N. and M.N. to aggravated circumstances, specifically chronic and severe neglect, under § 41-3-423(2)(a), MCA. In its findings of fact, the court indicated that in its experience, the Department's actions were "the most services it has seen provided to two parents by the department in regards to one on one training." Even with these services, the court found the behavior of the

6

parents was "not likely to change over time" and despite the love they had for the children, it was clear the needs of the children were "simply above the parental capacity of these parents." As a result, the court found the Department was not required to make reasonable efforts to reunify the children with Mother and Father. The court then ordered the termination of the parent-child relationship between M.N., J.N., R.N., and their parents, granting permanent legal custody to the Department. Mother and Father filed a timely notice of appeal to this Court.

## STANDARD OF REVIEW

¶14 "A court's decision to terminate a parent's legal rights to a child is not a decision made lightly." *In re D.V.*, 2003 MT 160, ¶ 26, 316 Mont. 282, 70 P.3d 1253. "We will presume that a district court's decision is correct and will not disturb it on appeal unless there is a mistake of law or a finding of fact not supported by substantial evidence that would amount to a clear abuse of discretion." *In re E.K.*, 2001 MT 279, ¶ 33, 307 Mont. 328, 37 P.3d 690. The right to parent is a fundamental liberty interest and an order terminating the right must be supported by clear and convincing evidence. *In re C.R.N.*, 1999 MT 92, ¶ 7, 294 Mont. 202, 979 P.2d 210. The best interests of the children are of paramount concern, however, and take precedence over parental rights. *In re A.H.D.*, 2008 MT 57, ¶ 13, 341 Mont. 494, 178 P.3d 131.

## DISCUSSION

¶15 *Whether the District Court erred in finding Mother and Father subjected M.N. and J.N. to chronic, severe neglect, obviating the need for reasonable reunification efforts under § 41-3-423(2)(a), MCA, and terminating Mother and Father's parental rights.*

¶16 Section 41-3-423(1), MCA, requires the Department to make "reasonable efforts to prevent the necessity of removal of a child from the child's home and to reunify families that have been separated by the state." However, the Department may request a determination that reunification services need not be provided if a child has been subjected to "aggravated circumstances, including but not limited to abandonment, torture, chronic abuse, or sexual abuse or *chronic, severe neglect of a child*." Section 41-3-423(2)(a), MCA (emphasis added).

¶17 Mother and Father advance two primary theories on appeal to challenge the District Court's finding of chronic, severe neglect. First, they argue the Department should not be permitted to turn a positive outcome into a negative outcome by re-trial. Second, they claim the aggravated circumstance of "chronic, severe neglect" should be reserved for more extreme cases. The parents argue the court erred in finding "chronic, severe neglect" and should have required the Department to provide reunification services.

¶18 Mother and Father first claim the evidence of the 2005 and 2007 petitions is irrelevant and therefore inadmissible, and evidence from the 2008 petition is barred by collateral estoppel. Without these pieces of evidence, appellants argue, the District Court lacked clear and convincing evidence of chronic, severe neglect because the finding would be premised on the head injury and accompanying home visit alone. The Montana Rules of Evidence apply to abuse and neglect proceedings, meaning irrelevant evidence is inadmissible. Section 41-3-422(4), MCA; M. R. Evid. 402. Mother and Father contend the District Court misapprehended the effect of evidence regarding the 2005 and

8

2007 petitions. They argue the 2005 and 2007 petitions pertained to C.N. and T.N., who are not involved in the current case, and therefore were irrelevant to the present question. At trial, Mother and Father failed to object on relevance grounds to witness testimony pertaining to the 2005 and 2007 petitions.

¶19 This court will not consider issues raised for the first time on appeal. *In re T.E.*, 2002 MT 195, ¶ 20, 311 Mont. 148, 58 P.3d 38 (citing cases). Since Mother and Father failed to object to testimony pertaining to the 2005 and 2007 petitions, we will not consider their argument as to relevance.

¶20 The parents next argue much of the evidence the Department presented in the current case already had been adjudicated during the 2008 petition. There, Mother and Father satisfactorily complied with the mandated treatment plan and the Department requested the petition be dismissed. The parents argue the Department should have been collaterally estopped from admitting evidence of the 2008 petition because the Department was effectively re-litigating the petition to establish chronic and severe neglect in the current petition. They claim the court erred in applying evidence of the circumstances of the 2008 petition to the current case and reaching a different result. Initially, they posit, the evidence garnered a dismissal of the Department's petition, but now the same evidence has resulted in termination of their parental rights. The parents raised one collateral estoppel objection at trial pertaining to Dr. Heberle's testimony as to her evaluation of Mother in 2008. The court overruled the objection, stating:

> [the] Court is charged under 41-3-609, Subsection (2), to determine whether or not the conduct or condition of a parent is unlikely to change within a reasonable time, and in order to do that the Court needs to have a

full understanding of the history of these two parents and their parenting skills over time.

¶21 "Collateral estoppel 'bars the reopening of an issue in a second cause of action that had been litigated and determined in a prior suit.'" *Dowell v. Mont. Dep't Pub. Health & Human Servs.*, 2006 MT 55, ¶ 34, 331 Mont. 305, 132 P.3d 520. Collateral estoppel applies when four elements are met. First, the issue decided in the prior adjudication must be identical to the issue in the present action. Second, there must have been a final judgment on the merits. Third, the party in the present action must have been a party or in privity with a party in the prior suit. Finally, the party against whom preclusion is asserted must have had a full and fair opportunity to litigate any potentially barred issue. *Dowell*, ¶¶ 34-35.

¶22 The most crucial component of the test is the first part, identifying the issues. *Stanley L. & Carolyn M. Watkins Trust v. Lacosta*, 2004 MT 144, ¶ 28, 321 Mont. 432, 92 P.3d 620. The "precise question" must have been litigated in the prior action to be an identical issue. *Watkins Trust*, ¶ 28. To determine if the issues decided in the previous and current adjudication are identical, "we compare the pleadings, evidence, and circumstances surrounding the two actions." *Baltrusch v. Baltrusch*, 2006 MT 51, ¶ 25, 331 Mont. 281, 130 P.3d 1267 (quoting *Holtman v. 4-G's Plumbing & Heating*, 264 Mont. 432, 439, 872 P.2d 318, 322 (1994)). Moreover, the "fact that each action arises from the same transaction does not mean that each involve[s] the same issues." *Watkins Trust*, ¶ 28 (citations omitted).

10

¶23 Here, the mere fact the 2008 petition and the current action both involved allegations of abuse or neglect does not mean the issues were identical. The two proceedings were part of the Department's continued involvement with this family. In the first proceeding, the petition was dismissed following a review hearing to determine whether the Department's temporary legal custody should be extended. Section 41-3-442, MCA. The issue in such a proceeding is whether additional time is necessary for completion of the treatment plan or continuation of temporary legal custody is necessary because of the child's individual circumstances. Section 41-3-442(4)(a), MCA. In the subsequent proceeding, the Department sought termination without preservation or reunification services on the ground of aggravated circumstances. Section 41-3-423(2)(a), MCA. In that proceeding, the issue was whether the parents had subjected the children to chronic, severe neglect justifying termination of parental rights without efforts at reunification. Section 41-3-423(2)(a), MCA.

¶24 Moreover, the case was not closed with a final judgment on the merits. Mother and Father do not get a clean slate by virtue of the Department's dismissal of the petition. The parents' acts of neglect which predicated the filing of the petition had been substantiated and resulted in a treatment plan under which extensive services were provided to the parents in an effort to keep the family together. The case was closed after the parents were "meeting minimal standards" and agreed to continue with services the Department had put into place. The order did not provide the dismissal was with prejudice. *See* Mont. R. Civ. P. 41(a).

11

¶25   The Montana Rules of Civil Procedure apply to abuse and neglect proceedings. Section 41-3-422(4), MCA.   Dismissal without prejudice does not operate as a final adjudication on the merits for purposes of preclusion.  *Schmitz v. Engstrom*, 2000 MT 275, ¶ 11, 302 Mont. 121, 13 P.3d 38.  *See also Rich v. State Farm Mut. Auto. Ins. Co.*, 2003 MT 51, ¶¶ 18, 23, 314 Mont. 338, 66 P.3d 274 (stating M. R. Civ. P. 41(a)(1) "carries forward part of the common law allowing a plaintiff to end a lawsuit without prejudice to bringing a later lawsuit.").  When the parents discontinued all services just a short time later, and the children were found back in an environment of neglect, the Department was within its statutory authority to seek a determination that further services were not required prior to termination of parental rights.

¶26   Appellant argues "the Department took what had been adjudicated a success and re-litigated it into a failure."  We disagree with this characterization.  Though the Department ultimately requested the 2008 petition be dismissed, the "success" of Mother and Father's parenting hinged on whether "they continued on with the services that were in place."  Mother and Father clearly failed to continue with services.

¶27   Dr. Heberle's testimony as to Mother's mental capacity to parent was one of many factors the court considered in making a determination of "chronic, severe neglect."  While the legislature did not define the term "chronic" under Title 41, we must implement its intent by viewing the plain meaning of the words used and applying their usual and ordinary meaning.  *City of Great Falls v. Mont. Dep't of Pub. Serv. Reg.*, 2011 MT 144, ¶ 18, 361 Mont. 69, 254 P.3d 595.  Webster's Dictionary defines "chronic" as "marked by long duration, by frequent recurrence over a long time, and often by slowly

12

progressing seriousness." *Webster's Third New International Dictionary* 402 (G & C Merriam Co. 1961). Mother's inability to parent, as assessed by Dr. Heberle, is a recurring, chronic problem based on her mental capacity, and her behavior over a three-year period proved her inability to successfully parent her three children.

¶28 Mother and Father maintain "chronic, severe neglect" should be reserved for more extreme cases. Mother and Father cite *In re D.S.*, 2005 MT 275, 329 Mont. 180, 122 P.3d 1239, as the type of neglect which equates to chronic and severe. In *D.S.*, we held the District Court properly terminated parental rights without offering reunification services because D.S. floated between various relatives for years while his birth mother battled drug addiction, went through treatment programs, and was incarcerated. *In re D.S.*, ¶¶ 7-10, 40. D.S. was left "twisting in the wind for several years to the point where he now needs intensive long-term therapeutic treatment." *In re D.S.*, ¶ 20. This behavior amounted to psychological neglect, which the District Court properly found to be "chronic, severe neglect of a child." *In re D.S.*, ¶¶ 23-24. As a result, D.S. suffered from extreme anxiety and emotional problems. *In re D.S.*, ¶¶ 26-29. Once in a stable foster home, D.S. made significant progress and the District Court heard testimony that it would be detrimental for him to be uprooted from a place where he was "happy, calm, and growing to trust adults." *In re D.S.*, ¶ 30. Reunification efforts were thus not required and would be contrary to the best interests of D.S. *In re D.S.*, ¶¶ 30-31.

¶29 The facts presented in *D.S.* are not considerably more extreme than those in the current case. While the parents' "sincere love for and desire to care for these children" contrast with the actions of the mother in *D.S.*, it is telling that fourteen months of

extensive services fell by the wayside within two months of the 2008 petition's dismissal by the court. Moreover, J.N. suffered a serious head injury for which Mother and Father's accountability was called into question, the home was found to be filthy, a highchair was caked with food, and a moldy bottle was being used to feed their baby. Coupled with the problems predicating the 2008 petition, the parents' actions amounted to "chronic, severe neglect" because they occurred over a long duration, were frequently recurring, and became more and more serious, culminating in a major injury to a toddler. Children need not be left to "twist in the wind" before neglect may be found chronic and severe.

¶30 We conclude the District Court was within its discretion in finding the parents' history, combined with the neglect which precipitated the filing of the 2010 petition, amounted to recurring instances over a long time, or chronic neglect. The pattern of conduct reflected an unsafe and unsanitary home, a serious and unexplained head injury to their child, failure by the parents to attend therapy treatments for the children, and cancellation of important family based services. This Court considers those repeated problems to be severe. Discrete instances of neglect, when viewed within a consistent pattern of similar behavior, provide a clear basis by which a district court can find "chronic, severe neglect."

¶31 The District Court recognized its obligation to review the likelihood of change in the parents' conduct "within a reasonable time." Section 41-3-609(2), MCA. The court specifically noted it had not seen a case where so many hours of one-on-one services were offered. Yet despite the services, Mother and Father failed to follow through and

keep up with the needs of the children. The backslide occurred within months of the petition being dismissed. The record provides ample evidence of instances of neglect and the parents' inability to improve their parenting capabilities. We cannot say the court abused its discretion in finding "chronic, severe neglect" and terminating the parental rights of Mother and Father without requiring reunification efforts.

¶32    Affirmed.


                                            /S/ BETH BAKER


We concur:


/S/ MICHAEL E WHEAT
/S/ PATRICIA COTTER
/S/ JAMES C. NELSON
/S/ JIM RICE