FILED

May 24 2016

*Ed Smith*
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 15-0646

DA 15-0646

# IN THE SUPREME COURT OF THE STATE OF MONTANA

## 2016 MT 124N

IN THE MATTER OF:

Y.G.,

    A Youth in Need of Care.

APPEAL FROM:    District Court of the First Judicial District,
In and For the County of Lewis and Clark, Cause No. ADN 2014-74
Honorable Mike Menahan, Presiding Judge

COUNSEL OF RECORD:

    For Appellant:

        Elizabeth Thomas, Elizabeth Cunningham Thomas, PLLC; Hebron, Ohio

    For Appellee:

        Timothy C. Fox, Montana Attorney General, Tammy A. Hinderman, Assistant Attorney General; Helena, Montana

        Leo John Gallagher, Lewis and Clark County Attorney, Lisa Leckie, Anne Peterson, Deputy County Attorneys; Helena, Montana

        Submitted on Briefs:  April 13, 2016

                Decided:  May 24, 2016

Filed:

                          Clerk

Justice Jim Rice delivered the Opinion of the Court.

¶1 Pursuant to Section I, Paragraph 3(c), Montana Supreme Court Internal Operating Rules, this case is decided by memorandum opinion and shall not be cited and does not serve as precedent. Its case title, cause number, and disposition shall be included in this Court's quarterly list of noncitable cases published in the Pacific Reporter and Montana Reports.

¶2 A.M. (Mother) appeals the order of the First Judicial District Court, Lewis and Clark County, holding that reasonable efforts were not required to reunify her with her son, Y.G., and terminating her parental rights. Mother also argues she was denied effective assistance of counsel during the termination proceedings. We affirm the termination of Mother's parental rights, and decline to remand for a hearing on Mother's claims of ineffective assistance of counsel.

¶3 Mother became pregnant with Y.G. while she lived in Tennessee. Mother's relationship with Y.G.'s natural father did not continue, and he is not a party in this action. Mother developed an online relationship with W.G., a man living in Helena. They married in Tennessee in January 2014, Mother moved to Montana with W.G., and Y.G. was born in Helena the following month.

¶4 The Department of Child and Family Services (the Department) first became involved with the family when Y.G. was born. At birth, Y.G. weighed 7 pounds, 12 ounces, and appeared to be "a healthy looking newborn." However, hospital staff made an initial report to the Department over concerns that arose about the social situation between Mother and W.G., as well as concerns about Mother's ability to care for Y.G.

Nursing staff reported that Mother was resistant to medical treatment for herself, and was "extremely reluctant to breastfeed or to pay attention to [Y.G.'s feeding] cues." Nursing staff also observed that Mother "was very reluctant to hold or touch him." Based on the referral, the Department opened a 60-day investigation, planning to monitor and assess Mother and Y.G. after they left the hospital.

¶5    When Y.G. was approximately 15 days old, Mother brought him in for a well-child visit at a local pediatric clinic. Although Y.G. weighed only slightly more than his birth weight, the pediatrician did not have any concerns about his weight or health. The pediatrician discussed feeding techniques, recommended certain frequency and length of feedings, and discussed usual newborn care topics with Mother at this appointment.

¶6    In April 2014, when Y.G. was six weeks old, the Department received a report that Mother and W.G. had left him unattended in his car seat in the car while they shopped. As a result of this report, social worker Brittany Divine (Divine) called Mother and W.G. into her office for a meeting. At the meeting, Divine became very concerned about Y.G.'s size ("he looked very small") and expressed her concerns to Mother and W.G. W.G. informed Divine that Y.G. had a well-child visit scheduled for the next day. At this exam, Y.G. weighed only 3 ounces more than he had weighed at birth. His pediatrician expressed concern, having expected him to "gain quite a bit more weight than that." The pediatrician discussed with Mother the importance of a frequent feeding schedule, suggested supplementing with formula after each feeding, and gave Mother additional breastfeeding resources. The pediatrician saw Y.G. in May 2014. At this visit, the

3

pediatrician was pleased to see that Y.G. weighed over 10 pounds and encouraged Mother to continue in the feeding routine she had been following. Once the 60-day period expired without further incident, the Department closed its case.

¶7 Because Mother did not bring Y.G. in for a four month or six month well-child visit, the pediatrician did not see Y.G. again until September 2014, when Y.G. was admitted to the hospital and diagnosed with failure to thrive. At seven months old, Y.G. weighed 8 pounds, 8 ounces, a mere 12 ounces more than his birth weight. Testimony from the pediatrician and nursing staff, and pictures of Y.G., documented that Y.G. appeared extremely malnourished, with ribs visible and a protruding abdomen, and no subcutaneous fat on his body. During the first few days of his hospital stay, Y.G. did not move his legs spontaneously, and could not raise or hold his head up on his own. The pediatrician testified that the process of Y.G. "wasting" would probably have occurred over a period of two or three months and that, without intervention, Y.G. "would have died from starvation."

¶8 The Department placed a hold on Y.G., preventing Mother from leaving the hospital with him. The pediatrician and nursing staff noted that, while in the hospital, Mother did not seem to appreciate the gravity of Y.G.'s condition, and she did not appear to be appropriately participating in his care. Nurses witnessed Mother feed Y.G. by propping him up on the bed while sitting in front of him, and also noted that Mother would not pick Y.G. up or hold him when not feeding. Several times, Mother asked nursing staff to feed Y.G. and to change his diapers. Y.G. remained in the hospital for 11 days, gained 2.5 pounds over that period of time, and was released to foster care.

4

¶9 Mother exercised some visitation with Y.G. after he was removed from her care. However, Y.G.'s therapist noted that Y.G. "seemed to be very triggered in her presence . . . [,]" and ultimately recommended that the visitation stop because "[h]e clearly seemed to be [] retraumatized by the visits." In April 2015, the Department petitioned the District Court to determine that preservation and reunification services need not be provided as to Mother, pursuant to § 41-3-423(2), MCA, and requested termination of her parental rights. After a hearing that spanned over several days, the District Court ordered that "[p]reservation/reunification services need not be provided for the birth mother for the reason that [Mother] subjected [Y.G.] to severe neglect, which constituted aggravated circumstances within the meaning of Montana Code Annotated § 41-3-423(2)(a)[,]" and terminated her parental rights.

¶10 Section 41-3-423(2)(a), MCA, provides that the Department may petition the court to determine that reunification services are not necessary if the court finds that the parent has "subjected a child to aggravated circumstances, including but not limited to . . . chronic, severe neglect of a child[.]" This finding must be supported by clear and convincing evidence. Section 41-3-423(4), MCA. We have previously construed chronic neglect to mean "'marked by long duration, by frequent recurrence over a long time, and often by slowly progressing seriousness.'" *In re M.N.*, 2011 MT 245, ¶ 27, 362 Mont. 186, 261 P.3d 1047 (citation omitted).

¶11 Mother argues that the Department failed to produce evidence that she had subjected Y.G. to chronic neglect. Mother "does not dispute that Y.G. was in a critical state" when admitted to the hospital in September 2014, and therefore apparently does

not dispute the finding of severe neglect. However, Mother argues that "[i]t is unknown how long Y.G.'s weight was declining[,]" and that "[a]t most, a period of two to three months passed when Y.G. was losing weight." While Mother acknowledges that this period of time is not insignificant, she argues it was not a sufficiently long enough period of time to support a finding that Y.G. was subjected to chronic neglect. Therefore, she argues that the District Court erred in so finding, and ultimately erred in terminating her parental rights.

¶12 This is an unfortunate case of child neglect where the facts speak for themselves. As the evidence establishes, concerns about Mother's ability to bond with and care for Y.G. were initially raised at his birth, when nursing staff noted with concern her reluctance to feed and touch her child. When Y.G. was six weeks old, Mother left him unattended in the car, again raising concerns about her judgment and ability to care for him. At the two month well-child visit, the pediatrician was concerned about Y.G.'s lack of weight gain, and provided Mother with extra resources to help ensure Y.G.'s proper nutrition and growth. Despite that, Y.G. was admitted to the hospital in an alarming condition after "two to three months" of inadequate care and nutrition, suffering from malnutrition and alienation from his mother. The evidence demonstrates the pattern of neglect that made up the first eight months of Y.G.'s life. Although the District Court did not specifically enter a finding that the neglect had been chronic, this conclusion follows implicitly from the findings of severe neglect, and is supported by the same evidence. *See In re J.B.*, 2016 MT 68, ¶ 25, 383 Mont. 48, 368 P.3d 715 (a district court's finding of birth father's inability to conform his conduct to the law necessarily implied the

findings of undisputed instances of father's disorderly conduct in jail). We affirm the District Court's order determining that reunification services were not required due to aggravating circumstances, and terminating Mother's parental rights.

¶13 Mother argues that she did "not have good communication" with counsel appointed to represent her, that her counsel failed to prepare for the termination hearing by reviewing the Department's file and pertinent medical records, and that counsel failed to retain an expert to rebut medical testimony offered by the Department's witnesses. We apply a two-pronged test for such claims: 1) whether a parent was represented by ineffective counsel, using several non-exclusive factors (training and experience, and advocacy); and 2) whether the parent suffered prejudice as a result of the ineffective representation. *See In re A.S.*, 2004 MT 62, ¶¶ 26, 31, 320 Mont. 268, 87 P.3d 408. From a review of the transcripts of the termination hearing, it is apparent that Mother's counsel had prepared for cross-examining the social worker. He questioned Divine specifically about her Family Functioning Assessment, at times referring her to statements and sections within the report. Mother's counsel made objections during the course of the hearing, and orally argued a previously-filed motion *in limine* that was decided during the hearing. In addition, when cross-examining Y.G.'s pediatrician, Mother's counsel pointed out a date where Mother had apparently brought Y.G. into the clinic for a weigh-in, alluding to a measurement on Y.G.'s growth chart that the pediatrician had not previously noted. It is clear from the record that Mother's counsel had prepared and reviewed prior to the termination hearing and advocated on her behalf, and we do not find Mother's argument persuasive that her counsel was ineffective.

7

Additionally, she makes no convincing showing that the outcome in her case would have changed with different representation, in light of the evidence presented, or that she suffered prejudice as a result.

¶14 We have determined to decide this case pursuant to Section I, Paragraph 3(c) of our Internal Operating Rules, which provides for memorandum opinions. In the opinion of the Court, the case presents a question controlled by settled law.

¶15 Affirmed.


/S/ JIM RICE


We concur:

/S/ MIKE McGRATH
/S/ BETH BAKER
/S/ PATRICIA COTTER
/S/ MICHAEL E WHEAT