FILED

02/25/2025

Bowen Greenwood
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 24-0423

DA 24-0423

IN THE SUPREME COURT OF THE STATE OF MONTANA

2025 MT 39N

IN THE MATTER OF:

A.R.,

        A Youth in Need of Care.

APPEAL FROM:    District Court of the Eighth Judicial District,
In and For the County of Cascade, Cause No. ADN-23-023
Honorable David J. Grubich, Presiding Judge

COUNSEL OF RECORD:

        For Appellant:

        Kelli S. Sather, Kelli S. Sather, PLLC, Missoula, Montana

        For Appellee:

        Austin Knudsen, Montana Attorney General, Katie F. Schulz,
Assistant Attorney General, Helena, Montana

        Joshua A. Racki, Cascade County Attorney, Valerie Winfield, Deputy
County Attorney, Great Falls, Montana

Submitted on Briefs:  February 12, 2025

Decided:  February 25, 2025

Filed:

_____
Clerk

Justice Jim Rice delivered the Opinion of the Court.

¶1    Pursuant to Section I, Paragraph 3(c), Montana Supreme Court Internal Operating Rules, this case is decided by memorandum opinion and shall not be cited and does not serve as precedent.  Its case title, cause number, and disposition shall be included in this Court's quarterly list of noncitable cases published in the Pacific Reporter and Montana Reports.

¶2    R.B.-F. (Mother) appeals the Order of the Eighth Judicial District Court, Cascade County, terminating her parental rights to daughter A.R, born in 2018.  Tragically, Mother has struggled with drug addiction for the entirety of A.R.'s life, and despite her numerous treatment efforts, the District Court found that she had been unable to prepare herself to parent A.R., or to demonstrate that she could effectuate change to the ongoing conduct or conditions rendering her unfit, within the reasonably foreseeable future.  We affirm.

¶3    Within two months of A.R.'s birth in 2018, the Department of Public Health and Human Services, Child and Family Services Division (Department) received a report that Mother, who was the subject of earlier reports made to the Department and was then under the influence of methamphetamine, had left A.R. unattended.  Department Child Protective Specialists (CPS) met with Mother, discussed services to assist Mother, and made referrals. A priority report received by the Department in 2019 led to a welfare check that found Mother under the influence of methamphetamine and exhibiting strange behaviors.  The Department initiated an emergency proceeding and placed A.R. in foster care with her maternal aunt (Aunt) until A.R. transitioned back to staying with Mother, following inpatient treatment, at a sober living facility.  After two years and seven months, the

Department obtained dismissal of that proceeding in November 2021. Within days and months of the closing of that case, the Department received further referrals regarding A.R.'s care.

¶4 After obtaining a housing voucher, Mother let it expire and instead moved into Aunt's residence. The Department received a report in March 2022 that Mother and Mother's mother (Grandmother), all living in Aunt's home, were using marijuana and methamphetamine. Relying on A.R.'s placement in the care of Aunt, the Department closed the report. After Aunt required Mother to move out, Mother moved to a hotel with A.R. in January 2023. From there, Mother sent concerning text messages to a friend about using drugs and being depressed, leading to a welfare check by law enforcement. Mother appeared to be under the influence of methamphetamine, had sores all over her body, and could not answer basic information questions. Because a male friend of Mother's appeared to be sober, officers left the hotel and made a report to the Department. A CPS followed up and insisted that A.R. be returned to Aunt's care. Mother accepted the Department's offer of a voluntary services protection plan.

¶5 In the following days, CPS Mitchell met with Mother and Grandmother, who complained the Department was not assisting enough with housing. CPS Mitchell made a referral for housing assistance and explained the need for Mother to work on her mental health and substance abuse issues under the voluntary plan. Mother said she had been to chemical dependency treatment previously and did not need to go again. Mother verbally agreed to cooperate, but was consistently resistant in follow-through, including in scheduling of visits, pursuing treatment, and monitoring for drug compliance.

3

¶6 Mother completed a chemical dependency (CD) evaluation that recommended Mother again seek inpatient treatment. Given that treatment objectives could not be completed within the timeframe of a voluntary agreement, the Department initiated another dependent and neglect proceeding to be able to monitor A.R.'s safety and condition. The initial show cause hearing was continued when Mother agreed to enter inpatient treatment, as recommended by the CD evaluation, at the Montana Chemical Dependency Center (MCDC). Mother was discharged from MCDC in April 2023 but did not attend the show cause hearing a week later, and it was again continued. Mother eventually stipulated to the adjudication of A.R. as a youth in need of care, and the Department proposed a treatment plan to address Mother's drug addiction and mental health needs, which required Mother to follow treatment recommendations, demonstrate sobriety through drug testing, attend visits with A.R., secure housing, and follow recommendations for improving her parenting skills. Mother, through counsel, did not enter any objections to the treatment plan, and stipulated to the Department having temporary legal custody of A.R.

¶7 After Aunt notified the Department that she was no longer able to care for A.R., the Department placed A.R. with a foster family who were friends of Mother. A.R. was then engaging in behaviors such as defiance and hitting, and the Department provided trauma therapeutic services to address these issues. A.R. responded well to treatment as reported by CPS Williams, and A.R.'s court appointed special advocate (CASA) later reported that she had adjusted well in her placement and had expressed to the CASA that she did not want to return to live with Mother, but did want to visit Aunt.

4

¶8 Mother was unable to consistently complete her treatment plan's tasks. After having one negative drug test after discharging MCDC in April 2023, she again started using methamphetamine. She was discharged from her aftercare outpatient treatment program for missing her appointments, and also missed many visits with A.R. CPS Williams attempted to meet with Mother to discuss getting back on her appointments and visits, but Mother failed to attend meetings or maintain contact. Mother did not attend a status hearing in August 2023, and CPS Williams expressed concern over the inability to communicate with Mother. CPS Williams was able to encourage Mother to again enter inpatient treatment, and Mother entered Recovery Centers of Montana (RCM) in September 2023, discharging in October 2023. In response to RCM's recommendation that Mother enter a sober living facility after discharge, CPS Williams made a referral, but Mother declined that option. Mother departed the Great Falls area, staying in the Flathead Valley for three months. When she returned to Great Falls, CPS Williams referred Mother to CD aftercare treatment. However, Mother did not consistently attend sessions, and was using methamphetamine again, reporting to CPS Williams that she was using to deal with the stress of finding employment and housing. In view of the failure of the treatment plan, the Department filed for termination of parental rights in November 2023. Mother did not oppose extensions of temporary legal custody. Mother requested and received extensions of time to prepare for the termination hearing, even as she continued to seek treatment. Although she continued to test positive for methamphetamine, she initiated mental health therapy in February 2024. At a hearing to extend temporary legal custody in May 2024, the District Court encouraged her to not give up as the preferred goal was "always to keep

5

the family together," but that the "process isn't going to do anybody any good if you're not fully involved. So keep that in mind when you walk out of here. Stay in contact with [counsel]. Stay in contact with the Department. Okay?"

¶9 Although CPS Williams reminded Mother about the termination hearing the day before, Mother did not appear for the June 20, 2024 hearing. Testimony was given by CPS regarding Mother's lack of completion of treatment tasks, including inability to complete sobriety programs and achieve sobriety, follow-up on referrals, maintain contact, and progress to visits with A.R. In her report to the court, the CASA stated that A.R. needed permanency, noting that A.R. had at that point been in out-of-home placement for 48 of the 68 months of her life.

¶10 The District Court found that, while Mother successfully completed inpatient CD treatment multiple times, she "did not substantially engage with her aftercare providers or demonstrate a sustained change in behavior." The court noted that she had been discharged from no less than five aftercare programs and had declined to enter sober living programs. Mother was discharged from several visitation service agencies for lack of engagement and inconsistent participation in visits with A.R. Virtual visits and phone visitations scheduled by CPS Williams were only sporadically attended by Mother. The District Court found that Mother "has not demonstrated ongoing sobriety," "has not demonstrated that she has stabilized her mental health or successfully engaged in or completed treatment," and "has not demonstrated that she has safe and stable housing that is appropriate for the Youth, or that she can meet the Youth's basic needs." The District Court found that A.R. had been in protective custody for over 15 months, the total being approximately 17 months of the

most recent 22 months, and therefore her best interests were presumed to be served by termination. *See* § 41-3-604(1), MCA.

¶11 We review a district court's decision to terminate parental rights for abuse of discretion. *In re J.B.*, 2016 MT 68, ¶ 10, 383 Mont. 48, 368 P.3d 715 (citing *In re A.N.W.*, 2006 MT 42, ¶ 29, 331 Mont. 208, 130 P.3d 619). "A district court's decision will not be disturbed on appeal unless there is a mistake of law or a finding of fact clearly erroneous that amounts to an abuse of discretion." *In re J.B.*, ¶ 11 (citing *In re M.N.*, 2011 MT 245, ¶ 14, 362 Mont. 186, 261 P.3d 1047). "A factual finding is clearly erroneous if it is not supported by substantial evidence, if the court misapprehended the effect of the evidence, or if review of the record convinces the Court a mistake was made." *In re J.B.*, ¶ 10 (citing *In re C.J.M.*, 2012 MT 137, ¶ 10, 365 Mont. 298, 280 P.3d 899). We review conclusions of law for correctness. *In re J.B.*, ¶ 9 (citing *In re J.N.*, 1999 MT 64, ¶ 11, 293 Mont. 524, 977 P.2d 317).

¶12 Mother argues the District Court abused its discretion by concluding that the Department had proven by clear and convincing evidence that the conditions rendering her unfit were unlikely to change in a reasonable time. However, the District Court first found the record facts referred to above, and again summarized this record to explain the basis for its decision. Mother also argues the District Court's findings were insufficient to demonstrate that the Department made reasonable efforts to assist Mother in addressing her conditions and reunifying with A.R. However, while the Department's reasonable efforts "may be a predicate for finding that the conduct or condition rendering a parent unfit, unwilling, or unable to parent is unlikely to change," it is "not a separate requirement

7

for termination." *In re R.L.*, 2019 MT 267, ¶ 18, 397 Mont. 507, 452 P.3d 890 (citing *In re R.J.F.*, 2019 MT 113, ¶ 26, 395 Mont. 454, 443 P.3d 387).  Even so, while not grouped together in a single finding, the District Court's findings include many references throughout the order to individual efforts made by the Department's CPSs to provide services to assist Mother.

¶13    We have determined to decide this case pursuant to Section I, Paragraph 3(c) of our Internal Operating Rules, which provides for memorandum opinions.  In the opinion of the Court, the case presents a question controlled by settled law or by the clear application of applicable standards of review.  This appeal presents no constitutional issues, no issues of first impression, and does not establish new precedent or modify existing precedent.  The District Court's findings of fact are not clearly erroneous, its interpretation and application of the law were correct, and its rulings were not an abuse of discretion.

¶14    Affirmed.

/S/ JIM RICE

We Concur:

/S/ CORY J. SWANSON
/S/ LAURIE McKINNON
/S/ BETH BAKER
/S/ INGRID GUSTAFSON