DA 12-0678

# IN THE SUPREME COURT OF THE STATE OF MONTANA

## 2013 MT 123

IN THE MATTER OF:

E.Z.C. and E.B.C.,

    Youths in Need of Care.

APPEAL FROM:    District Court of the Sixth Judicial District,
In and For the County of Park, Cause No. DN 12-4 and 12-5
Honorable Laurie McKinnon, Presiding Judge

COUNSEL OF RECORD:

    For Appellant:

        Julie Brown, Montana Legal Justice, PLLC; Missoula, Montana

    For Appellee:

        Timothy C. Fox, Montana Attorney General, Katie F. Schulz, Assistant Attorney General; Helena, Montana

        Brett D. Linneweber, Park County Attorney; Livingston, Montana

        Submitted on Briefs:  March 20, 2013

        Decided:  May 7, 2013

Filed:

                   Clerk

Justice Michael E Wheat delivered the Opinion of the Court.

¶1     J.C. (Mother) appeals from an order of the Sixth Judicial District Court, Park County, terminating her parental rights to her two children, E.B.C. and E.Z.C (the children). We affirm.

¶2     We review the following issue on appeal:

¶3     *Did the District Court err when it found Mother subjected the children to chronic abuse or chronic, severe neglect and terminated her parental rights without requiring reunification efforts and a treatment plan?*

## FACTUAL AND PROCEDURAL BACKGROUND

¶4     Mother and C.C. (Father) are the biological parents of the children. On January 18, 2012, law enforcement searched Mother's home, where she resided with three-year-old E.B.C. and seven-year-old E.Z.C, and discovered methamphetamine and drug paraphernalia in Mother's room. Mother and E.B.C. were home during the search; E.Z.C. was at school. Father was incarcerated in Lewis County Washington jail at the time. Mother was arrested for possessing methamphetamine and for criminal endangerment and the children were placed in foster care.

¶5     On January 25, 2012, the Department of Public Health and Human Services (Department) filed a petition for immediate protection and emergency protective services, for adjudication as youth in need of care and for temporary legal custody (TLC) in regard to the children. The District Court granted immediate protection and emergency protective

services and, after conducting a show cause hearing on February 28, 2012, determined there was probable cause the children were youths in need of care and granted the State TLC.

¶6 On April 2, 2012, the Department filed a petition to terminate Mother's parental rights and approve a permanency plan. The Department asserted that Mother subjected the children to aggravated circumstances pursuant to § 41-3-423(2)(a), MCA, and reunification efforts were not required. An adjudicatory hearing was held on May 14, 2012, at which time the court heard testimony from several witnesses. Among them was Jacqui Poe (Poe), a Department social worker with extensive experience and training in the investigation of child abuse, neglect, and endangerment. Poe is the case worker assigned to this matter and was called upon to find placement for the children after law enforcement searched Mother's home. Poe testified to the dirty conditions of the house—it was cluttered, had "stuff that was splattered on the side of the wall," and smelled like "rotten food, garbage, dirty laundry, body odor, cigarette smoke . . . ." Poe observed rats and animal feces on the children's bed, and noted the bed did not have any sheets on it. According to the children, the rats were pets. Poe stated E.B.C. was dirty with matted, tangled hair and had chocolate all over her face. E.B.C. told Poe that she consumed a candy bar for breakfast, and E.Z.C. later said that their diet was chips, candy, and popsicles. Poe also observed sores on E.B.C.'s face and scratches on her arms and legs. E.B.C. did not have warm winter clothing.

¶7 After transporting E.B.C. to a foster home, Poe picked up E.Z.C. from school and noted that he also did not have warm winter clothing. Poe testified that E.Z.C. told her he felt unsafe at home because he and E.B.C. were frequently left alone—sometimes at night—

3

and that he was required to take care of his three-year-old sister. Poe also stated that E.Z.C. described drug paraphernalia he had seen in his home and explained what Mother used them for. Poe testified that after the children were put in foster care, E.B.C. began to exhibit "bizarre behaviors" that were consistent with methamphetamine use. She had night sweats, was vomiting, and complained of things "crawling all over her." Patrick Minno, a scientist who conducts drug testing at Omega Laboratories, testified that a hair follicle test performed on E.B.C. came back positive for a low level of methamphetamine use.

¶8 Poe briefly testified about Mother's prior involvement with the Department and other child protective services. Specifically, Poe stated that in 2002, Mother relinquished her parental rights to a child in Washington State because the child was born with methamphetamine in his system. A few years later, in 2007, E.Z.C. was placed in foster care for approximately six months after Mother and Father were arrested for operating a marijuana grow operation and Mother admitted to using methamphetamine.

¶9 Detective Shawn Misner, one of the many detectives who searched Mother's home on January 18, 2012, also testified at the adjudicatory hearing. Detective Misner described the methamphetamine and drug paraphernalia discovered in Mother's bedroom, and noted the items were found in places that were "very accessible to a young child."

¶10 Jim Huntzicker, the principal at E.Z.C.'s school, testified to E.Z.C.'s attendance and performance at school. Huntzicker informed the court that when E.Z.C. lived with Mother he missed approximately one quarter of his school days and often times did not complete his homework. During this time E.Z.C. was quiet, constantly complained of being hungry, and

4

on occasion was not picked up from school by Mother. Huntzicker testified to a drastic improvement in E.Z.C.'s attendance and school performance since being placed in foster care.

¶11 The court also heard from Dr. Todd Steinmetz and Dr. Kathryn Wells. Dr. Steinmetz is an expert in pediatric dentistry who has provided dental care to E.B.C. since 2009. Dr. Steinmetz testified that over the past few years he has treated E.B.C. for tooth decay and an "excessive amount of childhood cavities," which included crowning and performing root canals on all four of E.B.C.'s front primary incisors.

¶12 Dr. Wells is an expert in child abuse pediatrics who testified about the risks and side effects associated with methamphetamine use. Specifically, Dr. Wells testified that methamphetamine ingestion by a young child could be toxic to the child and potentially fatal. Further, Dr. Wells addressed the concern that methamphetamine users cannot meet the needs of children, explaining that users often binge on the drug and then crash for days at a time during which they prioritize their drug use beyond anything else, including caring for their children.

¶13 At the end of the hearing, the District Court determined the children were "chronically and severely neglected" and were youths in need of care. The court ordered a dispositional hearing for June 26, 2012.

¶14 At the dispositional hearing, Poe expanded upon her testimony of the Department's prior involvement with Mother. Poe explained that in March 2007, E.Z.C. was found wandering by a creek unattended. E.Z.C. was three at the time. Law enforcement attempted

5

to locate Mother and Father at their home; Father was home but would not come to the door, and Mother was at work. When Mother came home, law enforcement entered the house and observed that it was extremely dirty and unsanitary and contained a marijuana grow operation of fifty-two marijuana plants. Mother stated she had been using methamphetamine—she admitted she would use it in the bathroom when E.Z.C. was sleeping and then wipe down the surface of the table. E.Z.C. was placed in foster care and the Department offered Mother and Father treatment plans, which included professional addiction treatment. Mother and Father successfully completed the plans and E.Z.C. was returned to their care.

¶15    Poe testified that since the 2007 incident, Mother's neglect has worsened. Specifically, she described E.B.C.'s severe dental decay, the extremely unsanitary conditions in which the children live—which include a rat feces infested bed—the exposure of both children to methamphetamine, and E.B.C.'s positive test for methamphetamine use. Further, Poe testified that there is a significant burden on E.Z.C. that did not exist in 2007—the duty to parent his three-year-old sister with such things as toileting, dressing, providing food, and running bath water because of Mother's neglect. Poe also indicated that there were concerns of domestic violence in the home between Mother and her boyfriend, Kenney Swanson, and possible harassment of E.B.C. by Swanson. Poe stated E.B.C. was fearful of men when living with Mother and would often defecate in her pants whenever a male approached her. Poe testified that the children have been doing much better since their placement in foster care.

6

¶16 Poe explained that the Department sought termination of Mother's parental rights based on its ten-year involvement with Mother during which she parented with "a blatant disregard for the children's safety." Poe noted that the Department already offered Mother a treatment plan after the 2007 incident. Because the neglect has only worsened with time and Mother continues to expose the children to severe danger, Poe did not recommend another treatment plan before terminating Mother's rights.

¶17 Laraine Lambert (Lambert), the CASA in the matter, also testified at the dispositional hearing. Lambert has observed Mother's visits with the children since their removal, and testified to an improvement in their contact and bond. Lambert stated she was "on the fence" regarding whether Mother should receive a treatment plan or, rather, have her parental rights terminated. Lambert testified that based on her "gut feeling" she believed there was "some possibility and potential" with Mother, and she therefore recommended a treatment plan.

¶18 On October 11, 2012, the District Court entered an order terminating Mother's parental rights. The court took judicial notice of the prior proceedings and testimony and incorporated them into its order. The court found the severity of the abuse and neglect had worsened over the Department's ten-year involvement with Mother, and Mother had failed to place the best interests of the children above her drug-seeking behaviors. The court determined Mother subjected the children to circumstances listed in § 41-3-423(2)(a), MCA, which amount to chronic abuse or chronic, severe neglect that create a substantial risk of serious bodily injury or death. Accordingly, the court terminated Mother's parental rights of the children without requiring reunification efforts or a treatment plan.

7

## STANDARD OF REVIEW

¶19 We review a district court's termination of parental rights for abuse of discretion. *In re T.W.F.*, 2009 MT 207, ¶ 17, 351 Mont. 233, 210 P.3d 174. A court abuses its discretion when it acts arbitrarily, without employment of conscientious judgment or in excess of the bounds of reason, resulting in substantial injustice. *In re A.J.W.*, 2010 MT 42, ¶ 12, 355 Mont. 264, 227 P.3d 1012. We review the findings of fact to determine whether they are clearly erroneous and the conclusions of law to determine whether they are correct. *In re T.W.F.*, ¶ 17. A finding of fact is clearly erroneous if it is not supported by substantial evidence, if the court misapprehended the effect of the evidence or if this Court is left with a definite and firm conviction that the district court made a mistake. *In re T.W.F.*, ¶ 17.

## DISCUSSION

¶20 *Did the District Court err when it found Mother subjected the children to chronic abuse or chronic, severe neglect and terminated her parental rights without requiring reunification efforts and a treatment plan?*

¶21 A parent's right to the care and custody of her child is a fundamental liberty interest which must be protected by fundamentally fair proceedings. *In re A.J.W.*, ¶ 15. A court may terminate the parent-child legal relationship upon clear and convincing evidence that the parent has subjected a child to aggravated circumstances, including but not limited to abandonment, torture, chronic abuse, or sexual abuse or chronic, severe neglect of a child. Sections 41-3-609(1)(d) and -423(2)(a), MCA. If the District Court makes this finding,

8

reunification efforts and a treatment plan are not required. Sections 41-3-609(4)(a) and -423(2)(a), MCA.

¶22 Clear and convincing evidence is

Simply a requirement that a preponderance of the evidence be definite, clear, and convincing, or that a particular issue must be established by a preponderance of the evidence or by a clear preponderance of the proof. This requirement does not call for unanswerable or conclusive evidence. The quantity of proof, to be clear and convincing, is somewhere between the rule in ordinary civil cases and the requirement of criminal procedure—that is, it must be more than a mere preponderance but not beyond a reasonable doubt.

*In re A.J.W.*, ¶ 15 (citing *In the Matter of E.K.*, 2001 MT 279, ¶ 32, 307 Mont. 328, 37 P.3d 690). The paramount concern is the health and safety of the child, and the district court must give "'primary consideration to the physical, mental and emotional conditions and needs of the child.'" *In re A.J.W.*, ¶ 15 (quoting § 41-3-609(3), MCA).

¶23 Mother contends the Department's involvement with her case amounted to "random and sporadic incidents" that do not show by clear and convincing evidence that she subjected the children to chronic abuse or chronic, severe neglect. Mother cites *In re D.S.*, 2005 MT 275, 329 Mont. 180, 122 P.3d 1239, and *In re M.N.*, 2011 MT 245, 362 Mont. 186, 261 P.3d 1047, as the type of circumstances necessary for a district court to find chronic abuse or chronic, severe neglect, and maintains her case is distinguishable because her history with the Department is not as extensive and the neglect not as severe.

¶24 In *D.S.*, the district court heard several witnesses testify to the impact that A.S.'s methamphetamine abuse had on her son, D.S. D.S. spent years floating from one person's home to another while A.S. was incarcerated or undergoing drug treatment, and as a result

did not form the strong bonds or experience the stability necessary to develop normally. *In re D.S.*, ¶ 25. Because of inconsistent caregiving and D.S. not feeling safe or secure in his surroundings, D.S. suffered from extreme anxiety and emotional problems and was diagnosed with anxiety disorder and reactive attachment disorder. *In re D.S.*, ¶¶ 26-29. Once D.S. was placed in a foster home, he was "happy, calm and growing to trust adults." *In re D.S.*, ¶ 30. We concluded there was substantial evidence for the district court to find that A.S. subjected D.S. to chronic and severe emotional neglect and to terminate parental rights. *In re D.S.*, ¶ 31.

¶25 In *M.N.*, we again upheld a district court's decision to terminate parental rights without requiring reunification efforts or a treatment plan due to a finding of aggravated circumstances. There, the Department's involvement with the parents began in 2005 when the father's two children from a previous marriage were adjudicated as youths in need of care. *In re M.N.*, ¶ 2. The father failed to complete his treatment plan and the children were placed with his ex-wife. *In re M.N.*, ¶ 2. Later, in an attempt to place the children back in the father's care, the Department provided services to the parents to teach them how to maintain a safe home and instruct them on family skill building, behavior skill building, and organization. *In re M.N.*, ¶ 2. However, the Department ultimately determined the children could not be placed in the parents' home and the father relinquished his rights to the children. *In re M.N.*, ¶ 3.

¶26 In 2008, a child protection specialist with the Department visited the parents' home on three different occasions and found it progressively messy and below minimum safety

standards. *In re M.N.*, ¶ 4. The parents had one child living with them at this time. The Department established a treatment plan for the parents and provided extensive services over the next fourteen months, including parenting and basic life skills training. *In re M.N.*, ¶¶ 5-6. However, in 2010 the parents ceased using all services and, not long after, their child was admitted to the hospital for a depressed skull fracture—the cause of the injury unknown. *In re M.N.*, ¶¶ 6-7. At this time, a social worker observed the home to be extremely dirty and saw the mother with a moldy bottle. *In re M.N.*, ¶ 8. The Department sought determination that reasonable efforts at reunification were not required under § 41-3-423(2)(a), MCA, and petitioned for termination of parental rights. *In re M.N.*, ¶ 11. The district court granted the Department's petition, determining the parents' behavior was "'not likely to change over time' and despite the love they had for the children, it was clear the needs of the children were 'simply above the parental capacity of these parents.'" *In re M.N.*, ¶ 13.

¶27 On appeal, we noted that the legislature did not define the term "chronic" under Title 41, and we thus looked to the dictionary definition to determine the plain meaning of the word. *In re M.N.*, ¶ 27. Webster's Dictionary defines "chronic" as "marked by long duration, by frequent recurrence over a long time, and often by slowly progressing seriousness." *Webster's Third New International Dictionary* 402 (G & C Merriam Co. 1961); *In re M.N.*, ¶ 27. We concluded "the parents' history, combined with the neglect which precipitated the filing of the 2010 petition, amounted to recurring instances over a long time, or chronic neglect." *In re M.N.*, ¶ 30. Further, we found that the "unsafe and unsanitary home, a serious and unexplained head injury to their child, failure by the parents

11

to attend therapy treatments for the children, and cancellation of important family based services" was severe. *In re M.N.*, ¶ 30.

¶28 In the case at hand, we disagree with Mother's assertion that her "random and sporadic" incidents of neglect do not constitute chronic abuse or chronic, severe neglect. "Discrete instances of neglect, when viewed within a consistent pattern of similar behavior, provide a clear basis by which a district court can find 'chronic, severe neglect.'" *In re M.N.*, ¶ 30. Similar to *D.S.* and *M.N.*, Mother's history of drug use and neglect of her children began several years ago and, despite having received services and a treatment plan in the past, only worsened with time. First, Mother gave birth to a child with methamphetamine in his system. A few years later, Mother allowed three-year-old E.Z.C. to wander unattended by a creek. During this time, Mother had a marijuana grow operation in her dirty, unsanitary home, and admitted to using methamphetamine while parenting. Most recently, the Department observed Mother subjecting the children to similar types of abuse and neglect, although even more severe. The court heard substantial testimony about the exceptionally dirty and unsanitary conditions in which the children were living, their poor diet, E.B.C.'s extreme tooth decay, the children frequently being left unattended and exposed to drugs, and, perhaps most severe, E.B.C.'s positive test for methamphetamine use.

¶29 We conclude that like *M.N.*, Mother's actions amounted to chronic, severe neglect because they occurred over a long duration, were frequently recurring, and became increasingly serious. As we have previously stated, "[c]hildren need not be left to 'twist in the wind' before neglect may be found chronic and severe." *In re M.N.*, ¶ 29.

12

¶30 Mother asserts the District Court relied predominantly on Poe's testimony and completely ignored the testimony offered by Lambert, which included a recommendation for a treatment plan. To the contrary, the court took Lambert's testimony into consideration—noting in its order that Lambert testified she was on the fence between a treatment plan and termination, and that her decision had a lot to do with her gut feelings—but ultimately was persuaded by Poe's testimony. It is within a court's realm to determine the credibility of witnesses and the weight to be given their testimony. *In re M.W.*, 2004 MT 301, ¶ 35, 323 Mont. 433, 102 P.3d 6. In this case, the record reveals the District Court's conclusion that Mother's abuse and neglect of her children has worsened over the past ten years and that reunification efforts and another treatment plan are not in the children's best interests is supported by the testimony presented.

¶31 In her reply brief, Mother argues that the District Court also erred by failing to make a finding regarding whether Mother's condition or conduct that caused the Department's involvement was likely to change within a reasonable time. However, this argument was not raised in Mother's opening brief, and we therefore will not address it. *See* M. R. App. P. 23(c); *Pengra v. State*, 2000 MT 291, ¶ 13, 302 Mont. 276, 14 P.3d 499 (holding that this Court will not address the merits of an issue presented for the first time in a reply brief).

## CONCLUSION

¶32 For the reasons stated above, we conclude the District Court did not abuse its discretion in terminating Mother's parental rights without requiring reunification efforts and a treatment plan.

13

¶33    Affirmed.

_____<br>/S/ MICHAEL E WHEAT

We concur:

/S/ MIKE McGRATH
/S/ BETH BAKER
/S/ BRIAN MORRIS
/S/ JIM RICE