FILED

07/12/2022

Bowen Greenwood
CLERK OF THE SUPREME COURT
STATE OF MONTANA

DA 21-0540

# IN THE SUPREME COURT OF THE STATE OF MONTANA

2022 MT 139N

IN THE MATTER OF:

R.J.E., J.B.R., A.C.R., and P. "Z." G.R.,

Youths in Need of Care.

APPEAL FROM:    District Court of the Thirteenth Judicial District,
In and For the County of Yellowstone, Cause Nos. DN 17-154, DN 17-155,
DN 17-156, and DN 18-016
Honorable Mary Jane Knisely, Presiding Judge

COUNSEL OF RECORD:

For Appellant:

Meri K. Althauser, Forward Legal, PLLC, Missoula, Montana
(for Father)

Gregory Birdsong, Birdsong Law Office, Santa Fe, New Mexico
(for Mother)

For Appellee:

Austin Knudsen, Montana Attorney General, Cori Losing, Assistant
Attorney General, Helena, Montana

John Waller Assistant Attorney General, Billings, Montana

Submitted on Briefs:   May 4, 2022

Decided:   July 12, 2022

Filed:

_____
Clerk

Justice Jim Rice delivered the Opinion of the Court.

¶1      Pursuant to Section I, Paragraph 3(c), Montana Supreme Court Internal Operating Rules, this case is decided by memorandum opinion and shall not be cited and does not serve as precedent. Its case title, cause number, and disposition shall be included in this Court's quarterly list of noncitable cases published in the Pacific Reporter and Montana Reports.

¶2      C.E. (Mother) and C.R. (Father) (collectively, "Parents"), appeal the October 4, 2021 Orders of the Thirteenth Judicial District Court terminating their parental rights to R.J.E., born 2013, A.C.R., born 2015, P.G.R., born 2016, and J.B.R., born 2018 (collectively, "the Children").[1] Parents challenge the underlying ruling that they subjected the Children to "chronic, severe neglect" under § 41-3-423(2)(a), MCA. We affirm.

¶3      On April 8, 2017, the Montana Department of Public Health and Human Services, Child and Family Services Division (the Department), received a report that A.C.R., then 21 months old, was found unattended at a park across the street from her home. Law enforcement knocked and rang the doorbell until Father answered the door "sweating and look[ing] like he had just woken up." He said he had been sleeping because he was "'under the weather,'" and that he had assumed A.C.R. had been playing with brother R.J.E. at a

---

[1] C.R. is the natural father of A.C.R. and P.G.R., the putative father of R.J.E., and the putative, and likely natural, father of J.B.R., although no conclusive testing was done. He has always considered himself the father of all four children.

2

neighbor's house for the preceding three hours. He later admitted he was unaware either child had left home.

¶4 A Child Protective Specialist (CPS) visited the home on April 10 and rang the doorbell for 15 minutes with no answer. Through the window she saw an infant, P.G.R., lying unattended on the sofa, and she called law enforcement to help access the home and P.G.R. Father then answered the door, stating he had been in the shower and had not heard the CPS at the door. He refused an offer for drug testing and stated he never had problems with drugs. The CPS later learned Father was under supervision for possession of dangerous drugs charges. At the time, Mother was serving five days at the Yellowstone County jail for a misdemeanor. Law enforcement and the CPS identified no apparent health or safety hazards in the home.

¶5 On the morning of April 12, the CPS again visited the home and after five minutes of knocking Mother answered the door. The CPS noticed Mother had "an ashy/grey color to her skin and it appeared moist. Her hands were shaking; she would not make eye contact, her speech was slow and sometimes slurred. [Mother's] pupils were contracted even in shadow." The CPS suspected drug use, but Mother refused testing. Father tested positive that day for amphetamine and meth, and the three children were removed and placed in emergency care.[2] Department staff noticed that A.C.R. had a rash and bug bites, P.G.R. had mats in her hair, and though less than two years old, A.C.R. acted maternally towards

---

[2] J.B.R. was not yet born.

3

her infant sister. Both sisters had ear infections and had not recently seen a medical provider; R.J.E. was diagnosed with the flu. All three children exhibited symptoms of staph infections.

¶6 Parents met with the Department for an interview where they both became argumentative. Mother again refused drug testing, became very upset, and left the office. The CPS noted Father was calmer and stated he would "do whatever was necessary to be reunified with his children," but that he also had pick marks on his face and track marks on his arms. J.B.R. was born in early January 2018, and he was soon placed in foster care with his siblings. The Department filed petitions for Emergency Protective Services (EPS), Adjudication as Youths in Need of Care (YINC), and Temporary Legal Custody (TLC) for the Children, alleging physical neglect due to "lack of adult supervision related to use of methamphetamine."

¶7 The District Court held a January 8, 2018 hearing where the parties stipulated to EPS, to adjudication of the Children as YINC, and to TLC by the Department. Parents expressed concern that the CPS was uncommunicative, and the Department reported that Father left "belligerent and aggressive" messages for the CPS, which in turn made her "wary" of returning Parents' calls. The District Court granted the Petitions and ordered the Department to develop treatment plans for Parents. The court approved the Department's proposed Phase I treatment plans for Mother and Father on February 20.

¶8 Parents struggled with their treatment plans. They failed to complete chemical dependency evaluations, regularly update the Department, or abide by its procedures.

Father only sporadically submitted to drug testing and refused to wear a drug monitoring patch. Mother ceased contact with the Department and did not enroll for any drug testing. Due to Parents' lack of progress, the Department filed a petition for termination of parental rights in August 2018, but by the November 5 termination hearing, the Department had moved to amend its petition for termination, reporting that Parents had recently become more engaged with treatment, and it now hoped for reunification. The District Court extended TLC to the Department for six months, giving Parents time to work on Phase II of their treatment plans, which were approved in April 2019. During supervised visits, the CPS became concerned when Parents argued and cursed in front of the Children. Starting in May, the Department began transitioning the Children back to Parents' care through a trial home visit. At this point, the Children had been in Department custody and foster care for over two years. During the trial visit, the Department received only one report alleging Mother was not properly supervising the Children. Overall, Parents showed enough improvement that the Department moved for dismissal of the cases, which the District Court granted on September 26, 2019.

¶9     Less than six months after dismissal, on March 5, 2020, the Department received a report that Mother had left the Children, now ages two through six, alone in a car for 30 minutes. The Department attempted to contact Parents at multiple addresses and by phone, but received no response. The Department received another report on April 15 that Parents were fighting in their yard in view of the Children. Law enforcement reported Mother had an outstanding warrant, was in possession of a meth pipe, and had admitted to using the

drug two days earlier while caring for the Children. A CPS interviewed the Children who stated Parents fought "with their words and hands," and that Father hit Mother in the face with an open hand. Father claimed the fight was not physical and that Mother no longer lived with him and the Children. The officer who witnessed the altercation stated Mother was the aggressor and had hit Father in the face. R.J.E. told the CPS that Mother still lived with them, and he nodded his head when asked if Parents' fighting ever got "scary." When the CPS informed Father that the Department would be removing the Children again, Father responded by yelling and swearing at the CPS. He offered to start drug testing again, but he refused drug patch monitoring. The CPS identified no immediate safety concerns or deficiencies in the home. The Children returned to their previous foster placements.

¶10 Upon removal, foster parents reported the Children disclosed more concerns and exhibited new, disturbing behavior. The Children reported they are often left home alone, "do not eat dinner very much," and are always thirsty. J.B.R. was thought to have a double ear infection. On April 21, the Department filed new petitions for EPS, adjudication as YINC, and TLC. Parents stipulated to continued EPS. The Department then petitioned the court to determine it no longer needed to provide preservation and reunification services because Parents had subjected the Children to "aggravated circumstances" under § 41-3-423(2), MCA. The Department later amended the Petition to specify that the aggravated circumstance was "chronic, severe neglect" of the Children.

6

¶11 The District Court held a contested hearing on January 11, 2021, to address adjudication of the Children as YINC, custody disposition, and the Department's Petition to no longer provide reunification services. The Children's counselor, clinical therapist Megan Owen, testified she had diagnosed all four children with Chronic Posttraumatic Stress Disorder (PTSD) and adjustment disorder, with anxiety. While her diagnoses were identical, Owen explained unique symptoms, indicators of progress, and therapeutic goals for each child. She recommended the Children have no contact with Parents until all goals were met. Although she arrived at her diagnoses and recommendation without meeting Parents, Owen testified she nonetheless concluded Parents were the cause of the Children's trauma and anxiety based on her observations of the Children during therapy sessions, storytelling and artwork by the Children, play therapy, and disclosures by the two oldest children, R.J.E. and A.C.R. Specifically, A.C.R. told Owen that the Children were left alone in the car for a long time on March 5, and that she had gotten out of the car in the parking lot in search of a bathroom. R.J.E. described to Owen several times "not having enough food to eat, not having food in the pantry, [and] having to try to find food for him and his younger siblings." R.J.E. told Owen he was "not being talked to nicely" at home, but he had "shut down" when asked to elaborate. According to Owen, R.J.E.'s artwork and play therapy indicated he had witnessed domestic violence. When asked if the Children's symptoms were possibly caused by the trauma of removal from Parents, Owen answered, "I would say anything is possible; but it is very unlikely."

7

¶12     Several Department personnel testified.  CPS Gates-Lanphear testified the police report of the April 15 fight stated Mother "threw something at [Father] and was poking him in the chest.  The kids witnessed this."  Following the second removal, Gates-Lanphear offered reunification services, including drug testing, parenting classes, and anger and domestic violence assessments, but Parents did not adequately cooperate or communicate.  Mother did little to engage with the Department and again refused drug testing.  Father "was extremely aggressive" to the point where the CPS felt threatened by his behavior.  He eventually agreed to wear a drug patch, but then failed to get it tested or reapplied.

¶13     CPS supervisor Goodman testified that, following the second removal, Father tested positive for meth again, and then discontinued drug monitoring.  The Department had concerns about Parents' volatile relationship that continued after the first removal.  Parents acted consistently hostile toward the Department, especially Father, who, during a recess at the hearing, physically intimidated Goodman and told her she should be ashamed of herself.  Another CPS testified she was currently offering services to Parents, but that they had not followed through.  She corroborated the other CPSs' testimony that Parents did not consistently drug test, if at all, and continue "to fail to comply with their plan and to engage with the department," remaining mostly unresponsive.

¶14     The foster mother for the three younger children testified that following the second removal, "they were very different children in regards to having completely different manners and very aggressive behaviors."  Within the first hour of returning to the foster home, when one child received a cup of water, the other children attempted to secure it for

8

themselves—fighting, choking, and biting each other. "It was almost like they thought that cup of water would be the very last cup of water they were ever going to see," the foster mom described. The children fought over food and drink, had a "very difficult time sitting down eating meals," and started taking food in the middle of the night and hoarding it in their rooms. She also observed anxious behaviors by the children such as picking at their skin, chewing their cheeks, and pulling out their hair. The foster mom testified that the children were now "doing incredibly well, especially in comparison to where they were."

¶15 Father testified he attended treatment for meth use following the first removal, and that his last test result was a false positive, possibly because "somebody sweated on me." He denied an addiction to meth, but he gave conflicting dates for his last drug use. When asked if he currently used "illegal drugs of any kind," Father responded, "No." He explained he had trouble consistently drug testing because patch monitoring was not conducive with his work schedule. He testified the Children never witnessed meth use by Parents or domestic violence between them. He denied being difficult with the Department, stating, "I did everything else they asked me to do, and I just would ask to see my children more." He asserted the Children did not display any anxiety or trauma-induced behaviors when they were living with him. According to Father, the only trauma the Children experienced was removal from Parents' care.

¶16 Mother testified that she only left the Children sleeping in the car for a short time on March 5 while she ran "real fast" into Walgreens to get toys for them. She did not have a valid driver's license at the time, but was driving the Children with Father's knowledge.

She explained that she did not receive the Department's calls following the incident because she did not have a working phone. As for the April 15 fight, she stated she had only visited Father's home to be with the Children for Easter, but had already moved out and separated from Father earlier that month. She admitted to throwing a jug of tea at Father and poking him in the chest. She testified that the last time she used meth was on April 12, 2020—three days before the fight, the discovery of the meth pipe on her person, and the second removal of the Children. The Department noted in its argument that April 12 was Easter; therefore, Mother used meth the day she celebrated with the Children.

¶17 Mother disagreed with Owen's diagnoses and testified that she did not believe the Children need to continue therapy, that the Children should be returned to Father, and that she should receive another treatment plan. When the guardian ad litem asked, "How long do you expect your kids to wait for you to get your act together?," Mother blamed the Department for "not being able to get in contact or answer their phone so we could get things moving forward." She told the court that she had essentially stopped cooperating with the Department following the second removal because she believed it was futile.

¶18 The guardian ad litem agreed with the Department's request for no reunification services and to adjudicate the Children as YINC, stating she believed there was sufficient evidence of chronic abuse and neglect and noting that the Children had been in foster care a significant portion of their lives. Parents' attorneys argued the evidence did not establish the Children are YINC or chronically, severely neglected by Parents, and pointed to factors

mitigating the severity of the incidents leading to the second removal. They asked for the Department to reunite Children with Father and provide Mother additional services.

¶19 The District Court chastised Father for threatening CPS Goodman, and for the "meth sweat" excuse he offered for his positive drug test result. The court warned Parents about their uncooperative interactions with the Department and addressed their refusal to consistently drug test, ordering them to submit to hair follicle tests directly after the hearing. The court verbally adjudicated the Children as YINC and granted the Department TLC. Parents did not comply with the Order to immediately drug test. Father eventually tested positive for meth, amphetamine, and marijuana. He then stopped responding to the Department. The Department reached out to Mother about getting her test and receiving services, but Mother never responded.

¶20 The District Court issued a March 29, 2021 Order (Reunification Order) concluding that clear and convincing evidence established Parents subjected the Children to chronic, severe neglect, pursuant to § 41-3-423(2)(a), MCA, and, therefore, the Department was no longer obligated to make efforts to reunify the Children with Parents. The court noted the Department's years-long reunification efforts and offers of services, the short time period between dismissal of the first cases and new reports of abuse and neglect leading to the Children's second removal, the testimony from the foster mother about the Children's concerning behaviors, Owen's diagnoses and recommendation, inconsistencies in Parents' testimonies, and Parents' long history of resisting the Department, particularly their refusal to consistently drug test.

¶21 The Department then filed a Petition for Termination of Parental Rights, and the District Court held a termination hearing on September 13. The Department asked the court take judicial notice of its finding in the Reunification Order that Parents had subjected the Children to chronic, severe neglect, and informed the court this was the basis for the Department's request for termination, which was supported by the guardian ad litem. Parents contested termination. Mother blamed Owen and the foster mother for being denied visitation with the Children. She also expressed frustration that Owen did not speak with Parents before she made her diagnoses. Father apologized for lying about his drug use at the previous hearing, but stated he started using drugs again only because the Department told him he was not getting his kids back. He blamed Mother's actions as the sole reason for the second removal and also blamed the foster mother, stating "she's been trying to adopt my kids since day one . . . . So they've alienated my children from me." He believed the Department did not offer him services because they incorrectly viewed him as difficult, when he "never messed up once." He described himself as protective and stated, "What, am I supposed to be nice to somebody trying to kidnap my kids?"

¶22 The District Court issued four identical Orders terminating the parental rights of Mother and Father (Termination Order),[3] primarily on the basis of the court's prior finding that Parents subjected the Children to chronic, severe neglect, and that no further treatment plans were required. The court awarded permanent custody to the Department and

---

[3] The Orders also terminated the parental rights of any unknown putative fathers for R.J.E. and J.B.R.

approved permanency plans recommending the Children be adopted by their foster parents. Mother and Father appealed separately, and we consolidated the four cases.

¶23 We review a district court's decision to terminate parental rights for abuse of discretion. "A court abuses its discretion when it acts arbitrarily, without employment of conscientious judgment or in excess of the bounds of reason, resulting in substantial injustice." *In re E.Z.C.*, 2013 MT 123, ¶ 19, 370 Mont. 116, 300 P.3d 1174 (citations omitted). "[T]he termination in Montana of a natural parent's right to care and custody of a child is a fundamental liberty interest, which must be protected by fundamentally fair procedures." *In re R.B.*, 217 Mont. 99, 103, 703 P.2d 846, 848 (1985); *see also Santosky v. Kramer*, 455 U.S. 745, 753-54, 102 S. Ct. 1388, 1394-95 (1982). "Thus, before terminating an individual parent's rights, a district court must adequately address each appliable statutory requirement" with specific findings of fact. *In re D.B.*, 2007 MT 246, ¶¶ 17-18, 339 Mont. 240, 168 P.3d 691 (citations and internal quotation omitted). We review the court's factual findings to determine if they are clearly erroneous and its conclusions of law for correctness. "A finding of fact is clearly erroneous if it is not supported by substantial evidence, if the court misapprehended the effect of the evidence or if this Court is left with a definite and firm conviction that the district court made a mistake." *E.Z.C*, ¶ 19 (citation omitted). "Substantial evidence is evidence that a reasonable mind might accept as adequate to support a conclusion, even if weak and conflicting." When determining whether substantial evidence supports the district courts' findings, we review the evidence in the light most favorable to the prevailing party. *In re*

*J.B.*, 2016 MT 68, ¶¶ 10, 24, 383 Mont. 48, 368 P.3d 715 (citations omitted). The Department must prove by clear and convincing evidence that statutory criteria for termination are met. "In the context of parental rights cases, clear and convincing evidence is the requirement that a preponderance of the evidence be definite, clear, and convincing." *In re C.S.*, 2020 MT 127, ¶ 9, 400 Mont. 115, 464 P.3d 66 (citation omitted).

¶24 The Department is generally obligated to make reasonable efforts to reunify separated families through provision of social services and treatment plans, and by helping parents complete their plans. Sections 41-3-423(1)(a), (b)(i), MCA. The Department may, however, at any time during an abuse or neglect proceeding, petition the district court for relief of this obligation. The court may determine that the Department need not provide further reunification services if it finds, by clear and convincing evidence, that the parent has subjected the child to "chronic, severe neglect." Sections 41-3-423(2)(a), (4), MCA; *see also* § 41-3-609(4)(a), MCA; *In re A.H.D.*, 2008 MT 57, ¶ 18, 341 Mont. 494, 178 P.3d 131. A court may then order the termination of parental rights, upon a finding established by clear and convincing evidence, that the parent has subjected the child to any of the aggravated circumstances listed in § 41-3-423(2)(a)-(e), MCA, including chronic, severe neglect. Section 41-3-609(1)(d), MCA; *A.H.D.*, ¶ 21.

¶25 Parents argue the District Court's finding of chronic, severe neglect in the Reunification Order is not supported by clear and convincing evidence. They focus on the incidents leading up to the two removals and argue that, while these allegations of neglect show instances of poor parenting, they are not as severe as in other cases where we have

affirmed findings of chronic, severe neglect. Father asserts, "it is clear that this case was decided based on *the least* evidence of severity ever presented in this Court's history." Parents advocate for another chance with new treatment plans.

¶26    In the context of § 41-3-423(2)(a), MCA, we define "chronic" as "marked by long duration, by frequent recurrence over a long time, and often by slowly progressing seriousness." *In re M.N.*, 2011 MT 245, ¶ 27, 362 Mont. 186, 261 P.3d 1047 (quoting *Webster's Third New International Dictionary* 402 (G&C Merriam Co. 1961)). A district court looks at the entire history of parental involvement with the Department.[4] "Discrete instances of neglect, when viewed within a consistent pattern of similar behavior, provide a clear basis by which a district court can find 'chronic, severe neglect.'" *M.N.*, ¶ 30.

¶27    Here, the Department first removed the Children for lack of adult supervision and for drug use by Parents, suspected of Mother and confirmed for Father. Once removed, Children showed physical and behavioral evidence of neglect. During supervised visits, the Department was concerned about Parents' "volatile relationship" and their fighting in front of the Children. The Department offered reunification services following the first removal, and, although initially resistant, when faced with termination Parents eventually made enough progress with their treatment plans for a trial home visit. The Children were thereafter fully returned to Parents' custody and the Department dismissed the cases, about two-and-a-half years after the Children were first removed. Within six months, the

---

[4] Here, the District Court reviewed all substantiated reports by the Department since 2017, and noted it did not consider earlier, unsubstantiated reports.

15

Department received another report that the Children were left unsupervised, followed by a report of Parents fighting in front of the Children. Law enforcement, the Children, and Mother said the fight turned physical. This time, Mother's drug use was confirmed. Once removed a second time, the Children showed escalated behaviors consistent with physical neglect, including aggression and food hoarding, and Owen diagnosed each child with chronic PTSD and adjustment disorder with anxiety.[5] The Children's behaviors improved after spending time with their foster parents. *See In re Custody & Parental Rights of D.S.*, 2005 MT 275, ¶¶ 25, 28, 30, 329 Mont. 180, 122 P.3d 1239 (child's aggressive behavior improved when living with relatives or foster parents; it deteriorated when he was returned to mother); *see also C.S.*, ¶ 18. Parents displayed increased aggression and resistance to outreach by the Department. In sum, the Children were removed two times in three years for similar concerns, with progressive seriousness. During those years, the Children only spent approximately six months in Parents' care without Department support or intervention. The discrete incidents of neglect leading up to the removals occurred within a consistent pattern of similar behavior by Parents over a long duration, dating back to 2017. This was an acceptable basis for the District Court to find chronic, severe neglect. *M.N.*, ¶¶ 27, 30.

---

[5] Parents take issue with Owen's methods leading to the identical diagnoses and her testimony linking the Children's negative and anxious behaviors with trauma inflicted by Parents. Parents brought similar objections to the District Court. "This Court should not reweigh conflicting evidence or substitute its judgment regarding the strength of the evidence for that of the district court." *In re Declaring A.N.W.*, 2006 MT 42, ¶ 29, 331 Mont. 208, 130 P.3d 619 (citation omitted). The District Court acted within its authority to credit Owen's testimony and reject Parents' conflicting explanations for the Children's behaviors.

16

¶28 Mother's statement in her briefing that "there was no substantive evidence of frequent, ongoing, or severe drug use by either parent" is not persuasive. We cannot ignore that Parents showed a consistent pattern of drug use throughout the Department's years-long involvement. Each removal occurred after verified evidence of drug use by either Mother or Father. Father tested positive for meth and other substances on three separate occasions—spanning from April 2017 to January 2021. Mother was in possession of a meth pipe and admitted to using the drug when caring for the Children—this occurred after the Children were returned to Parents. The record contains many reports of Parents resisting drug testing, despite many efforts by the Department. Mother even ignored a clear court order for hair-follicle testing following the January 11, 2021 hearing. Parents' testimony at multiple hearings shows neither parent taking responsibility for their substance abuse and its effect on the Children. Parents either made excuses for why they could not drug test, gave justifications for, or minimized the seriousness of, their verified drug use. With the exception of a few brief periods of relative success, these behaviors show a consistent pattern from the first removal through the termination hearing, during which Parents still blamed others.

¶29 Mother also claims that, although the Department was involved with Parents for a long time, "that involvement was not consistent, responsive, or supportive. If it had been, [Parents] would have received treatment plans sooner and would have had better results at

the conclusion of the first removal."[6]  Parents offered similar explanations to the District Court, and the court was free to accept or reject them at that time.  The record contains abundant evidence that it was largely Parents' unwillingness to stay in contact and follow Department directions, particularly when it came to drug testing, that resulted in their lack of success.  The District Court was within its authority to credit this evidence over Parents' complaints about the Department.  *A.N.W.*, ¶ 29.

¶30     Parents next argue that the Court erred by relying on *C.S.* in its Reunification Order; they assert the case is distinguishable from their situation due to the severity of the abuse and neglect present in *C.S.* and our other precedent.  In *C.S.*, the child was removed three times within two years from a mother who long struggled with substance abuse.  Following each removal, the mother completed a treatment plan, the child was returned, and the case was dismissed, only for the child to be removed again for similar reasons within a short period of time.  *C.S.*, ¶ 3.  There, we affirmed the district court's finding of chronic, severe neglect.  *C.S.*, ¶ 18.  In its Reunification Order, the District Court noted similarities between the Children's cases and *C.S.*:

> In the immediate case, while the parents have not had the children removed three prior times, more than two years had passed before the parents were considered to have completed their treatment plans and the causes dismissed. Unfortunately, like in [*C.S.*], little time passed before another report alleging abuse/neglect was received by the Department in March 2020.   The Department received yet another report in April 2020 before the Department

---

[6] While it took time to set a hearing, the Department proposed treatment plans for Parents on January 12, 2018, within four days of Parents stipulating to EPS, YINC, and TLC.

18

had even established contact with the parents or children to investigate the March 2020 report.

These comparisons are appropriate. Regardless, while helpful, it is not necessary to locate a precisely similar factual pattern in our precedent to affirm the court's conclusion. The District Court's findings are not clearly erroneous. Substantial evidence in the form of testimony and Department records support all factual findings in the court's Reunification Order. *J.B.*, ¶¶ 10, 24. The District Court did not misapprehend the effect of that evidence, and we are not left with a definite and firm conviction that the court made a mistake. *E.Z.C.*, ¶ 19. Based on these findings, the District Court did not err in its conclusion of law because the situation fits within our definition of chronic, severe neglect. Once the District Court made that finding, it was within its discretion to terminate Parents' rights on that basis. Section 41-3-609(1)(d), MCA.

¶31 Father argues the District Court relied too heavily on the best interests of the Children and Owen's recommendation for no contact rather than considering whether there existed clear and convincing evidence for chronic, severe neglect. As noted, the District Court could consider Owen's recommendation as evidence for its finding. As for best interests, the District Court found chronic, severe neglect without any reference to the best interests of the Children in its Reunification Order. In its Termination Order, the District Court gave alternative bases for termination that included language from §§ 41-3-609(2) and (3), MCA, as well as multiple statements that termination was in the best interests of the Children. "[T]he best interests of the children are of paramount concern in a parental rights termination proceeding and take precedence over the parental rights." *A.H.D.*, ¶ 13.

19

*See also* § 41-3-602, MCA. Ultimately, a statutory finding of chronic, severe neglect is an independent and sufficient basis to terminate parental rights under § 41-3-609(1)(d), MCA, and the District Court properly incorporated this earlier finding from the Reunification Order into its Termination Order. *See A.H.D.*, ¶¶ 10, 23.

¶32 We have determined to decide this case pursuant to Section I, Paragraph 3(c) of our Internal Operating Rules, which provides for memorandum opinions. In the opinion of the Court, the case presents a question controlled by settled law or by the clear application of applicable standards of review. The District Court's ruling was not an abuse of discretion.

¶33 Affirmed.

/S/ JIM RICE

We concur:

/S/ MIKE McGRATH
/S/ JAMES JEREMIAH SHEA
/S/ INGRID GUSTAFSON
/S/ DIRK M. SANDEFUR